# EXHIBIT 1

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Brittany S. Scott (State Bar No. 327132)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
       bscott@bursor.com

*Attorneys for Plaintiff*

**ELECTRONICALLY FILED**
Superior Court of California
County of Sacramento
03/04/2024
By: _____ Deputy
R. Fisher

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR THE COUNTY OF SACRAMENTO

| | |
|---|---|
| CHRISTINA KING, individually and on behalf of all others similarly situated,<br><br>              Plaintiff,<br><br>   v.<br><br>HARD ROCK CAFE INTERNATIONAL (USA), INC.,<br><br>              Defendant. | Case No.  24CV004071<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff Christina King files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Hard Rock Cafe International (USA), Inc. ("Defendant" or "Hard Rock"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of all California residents who have accessed and used hardrockhotels.com (including its subsidiary pages, formatted as hardrockhotel[destination].com) (the "Website"), a website that Defendant owns and operates.

2.      Defendant aids, employs, agrees with, or otherwise enables a third party, Meta Platforms, Inc. ("Facebook"), to eavesdrop on communications sent and received by Plaintiff and Class Members, including communications that contain sensitive and confidential information (i.e., "guest records," as defined by Cal. Civil Code § 53.5). By failing to procure consent before enabling Facebook's interception of these communications, Defendant violated the California Invasion of Privacy Act ("CIPA") §§ 631-632.

## PARTIES

3.      Plaintiff Christina King is a resident and citizen of Sacramento, California. In or around 2010, Plaintiff King created a Facebook account. Several times, including on or around March 29, 2023 and June 6, 2023, Plaintiff King visited the Website operated by Defendant (specifically, hardrockhotelsacramento.com), on the same browser that she used to access Facebook. Plaintiff King was in California when she visited the Website. Upon accessing the Website, as alleged in greater detail below, Plaintiff King browsed and booked a Hard Rock hotel. Each of these communications was intercepted in transit by Facebook—as enabled by Defendant—including communications that contained Plaintiff King's confidential "guest records," as defined by Cal. Civil Code § 53.5.[1] Neither Defendant nor Facebook procured Plaintiff King's prior consent to this

---

[1] *See* Exhibit A, a report of Plaintiff King's activity off Meta technologies, as described at https://www.facebook.com/help/2207256696182627. This report evinces activity received from the Website.

1   interception.

2       4.     Defendant Hard Rock Cafe International (USA), Inc. is a Florida corporation with its

3   principal place of business at 5701 Stirling Road, Davie, Florida, 33314.  Defendant does business

4   across the nation and operates several hotels throughout California.[2]

5                              **JURISDICTION AND VENUE**

6       5.     This Court has subject matter jurisdiction over this action pursuant to Article VI,

7   section 10 of the California Constitution and Cal. Code Civ. Proc. § 410.10.  This action is brought

8   as a class action on behalf of Plaintiff and Class Members pursuant to Cal. Code Civ. Proc. § 382.

9       6.     This Court has personal jurisdiction over Defendant.  *First*, as noted above, Defendant

10  operates hotels throughout California.  Thus, Defendant has availed itself of the privilege of doing

11  business in California.  *Second*, the Website (and Facebook's wiretapping thereof) is directly linked

12  to Defendant's physical operations in California, in that individuals utilize the Website to pursue and

13  exchange information regarding Defendant's California locations.  Thus, the conduct at issue here is

14  directly related to Defendant's business in California.  *See Kauffman v. Papa John's Int'l, Inc.*, 2024

15  WL 171363, at *3-4 (S.D. Cal. Jan. 12, 2024).  *Finally*, Plaintiff and Class Members were harmed

16  in California because that is where Facebook—as enabled by Defendant—wiretapped Plaintiff and

17  Class Members.

18      7.     This Court is the proper venue for this action under the Cal. Code Civ. Proc.

19  § 395.5 because Plaintiff was unlawfully wiretapped by Facebook—as enabled by Defendant—in

20  this County.  Thus, a substantial part of the events, omissions, and acts giving rise to the claims

21  herein occurred in this County.

22                              **FACTUAL ALLEGATIONS**

23  **I.     The California Invasion of Privacy Act**

24      8.     The California Legislature enacted the Invasion of Privacy Act to protect certain

25  privacy rights of California citizens.  The legislature expressly recognized that "the development of

26  new devices and techniques for the purpose of eavesdropping upon private communications … has

27  _____

28  [2] https://www.hardrockhotels.com/destinations.aspx.

created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

9.     The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call.*" *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added)

10.     Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (emphasis added; internal citations omitted).

11.     As part of CIPA, the California Legislature enacted § 631(a), which prohibits any person or entity from [i] "intentionally tap[ping], or mak[ing] any unauthorized connection … with any telegraph or telephone wire," [ii] "willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any . . . communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]," or [iii] "us[ing], or attempt[ing] to use . . . any information so obtained."

12.     CIPA § 631(a) also penalizes [iv] those who "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

13.     As part of the Invasion of Privacy Act, the California Legislature additionally introduced Penal Code § 632(a), which prohibits any person or entity from "intentionally and

1    without the consent of all parties to a confidential communication, us[ing] an electronic amplifying

2    or recording device to eavesdrop upon or record [a] confidential communication."

3        14.    A "confidential communication" for the purposes of CIPA § 632 is "any

4    communication carried on in circumstances as may reasonably indicate that any party to the

5    communication desires it to be confined to the parties thereto."  Cal. Penal Code § 632(c).

6        15.    Individuals may bring an action against the violator of CIPA §§ 631 and 632 for

7    $5,000 per violation.  Cal. Penal Code § 637.2(a)(1).  Plaintiff does so, here, against Defendant.

8    **II.    California Civil Code § 53.5**

9        16.    As the California Legislature recognized, a "guest record" maintained by an owner or

10   operator of an inn, hotel, motel, lodginghouse, or other similar accommodations is confidential.  Such

11   an owner or operator "shall not disclose, produce, provide, release, transfer, disseminate, or

12   otherwise communicate, except to a California peace officer, all or any part of a guest record orally,

13   in writing, or by electronic or any other means to a third party without a court-issued subpoena,

14   warrant, or order."  Cal. Civil Code § 53.5(a).

15       17.    Per Cal. Civil Code § 53.5(c):

16           "Guest record" for purposes of this section includes any record that
17           identifies an individual guest, boarder, occupant, lodger, customer, or
             invitee, including, but not limited to, their name, social security number or
18           other unique identifying number, date of birth, location of birth, address,
             telephone number, driver's license number, other official form of
19           identification, credit card number, or automobile license plate number.

20       18.    Further, the legislative history of § 53.5 indicates:

21           (a) In 1972, California voters amended the California Constitution to
22           include the right of privacy among the "inalienable" rights of all people.
             The amendment established a legal and enforceable right of privacy for
23           every Californian. Fundamental to this right of privacy is the ability of
             individuals to control the use of their personal information.
24
25           (b) Since California voters approved the right of privacy, the California
             Legislature has adopted specific mechanisms to safeguard consumer
26           privacy, including the California Consumer Privacy Act of 2018, the
             Online Privacy Protection Act, the Reader Privacy Act, the Privacy Rights
27           for California Minors in the Digital World Act, and Shine the Light, a
             California law intended to give Californians the 'who, what, where, and
28

when' of how businesses handle consumers' personal information.

(c) Californians frequently have to disclose their sensitive personal information to third parties in order to accomplish routine activities: apply for a job; apply for housing; raise a child; drive a car or take transportation; or stay at a hotel or motel.

(d) California law has not kept pace with these developments and the personal privacy implications surrounding the collection, use, and protection of personal information by third parties.

(e) Many businesses collect personal information from California consumers. They may know where a consumer lives, how many children a consumer has, where a consumer lives and works, where a consumer travels and where they stay on their trip, how fast a consumer drives, a consumer's personality, sleep habits, biometric and health information, financial information, precise geolocation information, and social networks, to name a few categories.

(f) The unauthorized disclosure of personal information and the loss of privacy can have devastating effects for individuals, including financial fraud, identity theft, unnecessary costs to personal time and finances, destruction of property, harassment, reputational damage, emotional stress, and even potential physical harm.

(g) When Californians leave their homes to travel via bus or stay at lodging establishments throughout their state, they desire assurances that these businesses will respect their privacy and safeguard their personal information from improper disclosure.

(h) Protecting the privacy of personal information promotes consumer confidence and encourages both residents and visitors to travel to and within California and to patronize California businesses.

(i) Therefore, it is the intent of the Legislature to further Californians' right to privacy by ensuring that the personal information disclosed by patrons of lodging establishments and bus companies is used for the intended business purposes and not improperly disclosed.

California S.B. 1194 (September 27, 2018).[3]

19.    Thus, "guest records" identifying Website users as Hard Rock guests, boarders, occupants, lodgers, customers, or invitees (*i.e.*, name, address, telephone number, credit card

---

[3] https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB1194.

number, email address, ZIP code, and user-specific values contained in Facebook cookies, as described *infra*) are confidential, under California law.

**III.     Facebook, As Enabled by Defendant, Wiretaps Californians' Communications, in Violation of CIPA**

      **A.     Overview of Facebook's Advertising Platform and the Meta Pixel**

20.     Facebook describes itself as a "real identity platform,"[4] meaning users are allowed only one account and must share "the name they go by in everyday life."[5]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[6]

21.     In 2021, Facebook generated $117 billion in revenue.[7]  Roughly 97% of that came from selling advertising space.[8]

22.     Facebook sells advertising space by highlighting its ability to target users.[9]  Facebook can target users so effectively because it surveils user activity both on and off its site.[10]  This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[11]  Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[12]

---

[4] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[5] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[6] FACEBOOK, SIGN UP, https://www.facebook.com/

[7] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx

[8] *Id.*

[9] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[10] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[11] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[12] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

---

23.     Advertisers can also build "Custom Audiences."[13]   Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[14]  With Custom Audiences, advertisers can target existing customers directly, and can also build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[15]

24.     Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools."[16]

25.     As Facebook puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with Facebook, understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[17]

26.     Put succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

27.     The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when

---

[13] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/ 744354708981227?id=2469097953376494.

[14] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[15] Facebook, About Lookalike Audiences, https://www.facebook.com/business/help/ 164749007013531?id=401668390442328.

[16] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/ business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id= 2469097953376494.

[17] FACEBOOK, THE FACEBOOK BUSINESS TOOLS, https://www.facebook.com/help/ 331509497253087.

1   a user downloads a mobile application or makes a purchase.[18]  However, Facebook's Business Tools

2   can also track other events.  Facebook offers a menu of "standard events" from which advertisers

3   can choose, including what content a visitor views or purchases.[19]  Advertisers can even create their

4   own tracking parameters by building a "custom event."[20]

5          28.     One such Business Tool is the Facebook Tracking Pixel.  Facebook offers this piece

6   of code to advertisers, like Defendant, to integrate into their websites.  As the name implies, the

7   Facebook Tracking Pixel "tracks the people and type of actions they take."[21]  When a user accesses

8   a website hosting the Facebook Tracking Pixel, Facebook's software surreptitiously directs the user's

9   browser to simultaneously send a separate message to Facebook's servers.  This second, secret

10  transmission contains the original GET request sent to the host website, along with additional data

11  that the Pixel is configured to collect.  This transmission is initiated by Facebook code and concurrent

12  with the communications with the host website.  Two sets of code are thus automatically run as part

13  of the browser's attempt to load and a website: the website's own code, and Facebook's embedded

14  code.

15         29.     An example illustrates the point.  Take an individual who navigates to the Website

16  and clicks on a button to browse Defendant's offerings.  Once that button is clicked, the individual's

17  browser sends a GET request to Defendant's server requesting that server to load the particular

18  webpage.  Because Defendant utilizes the Facebook Tracking Pixel, Facebook's embedded code,

19  written in JavaScript, sends secret instructions back to the individual's browser, without alerting the

20  individual that this is happening.  Facebook causes the browser to secretly and simultaneously

21  duplicate the communication with Defendant, transmitting it to Facebook's servers alongside

22  ---

[18] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://
23  developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES
FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=
24  1205376682832142; FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/
marketing-api/app-event-api/.

25  [19] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://
www.facebook.com/business/help/402791146561655?id=1205376682832142.

26  [20] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/
27  business/help/964258670337005?id=1205376682832142; *see also* FACEBOOK, APP EVENTS API,
https://developers.facebook.com/docs/marketing-api/app-event-api/.

28  [21] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

1    additional information that transcribes the communication's content and the individual's identity.

2    This entire process occurs within milliseconds.

3        30.    In other words, when a user communicates with Defendant's Website, those

4    communications are simultaneously and contemporaneously duplicated and sent to Facebook at the

5    same time as they are being sent to Defendant.    Thus, Facebook's interception of these

6    communications occurs "in transit."  *See*, *e.g.*, *In re Facebook Internet Tracking Litig.*, 956 F.3d 589,

7    608 (9th Cir. 2020) ("Permitting an entity to engage in the unauthorized duplication and forwarding

8    of unknowing users' information would render permissible the most common methods of

9    intrusion…"); *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019)

10   ("Even if the browser caused a parallel signal to be sent to NaviStone, that intervention happened

11   while the signal was already in transit from Revitch's device. Section 631's protections extend

12   explicitly to the beginnings and ends of communications…"); *James v. Walt Disney Co.*,

13   --- F. Supp. 3d ---, 2023 WL 7392285, at *15-16 (N.D. Cal. Nov. 8, 2023) (finding in-transit

14   interception was alleged based on similar process to the one alleged herein).

15       31.    After collecting and intercepting this information, Facebook processes it, analyzes it,

16   and assimilates it into datasets like Core Audiences and Custom Audiences.

17       32.    Facebook's other Business Tools function the same.    For mobile applications,

18   advertisers can utilize the Facebook SDK, which contains "component SDKs," like the App Events

19   API, allowing advertisers to track events on their mobile apps so they can "measure ad performance

20   and build audiences for ad targeting."[22]

21       33.    Advertisers can also utilize the "Conversions API."    The Conversions API lets

22   advertisers circumvent a user's choice to exercise privacy controls.[23]    More technically, the

23   Conversions API is Facebook code that advertisers can implement server-side.[24]  Because it operates

24   server-side, the Conversions API ignores users' decision to opt out of tracking, collecting the same

---

[22] FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[23] FACEBOOK, CONVERSIONS API, https://developers.facebook.com/docs/marketing-api/conversions-api.  This refers to device specific privacy controls.

[24] *Id.*

1    data it would otherwise through "a connection between an advertiser's server and Facebook." [25]

2        34.    When the Conversions API collects "[s]erver events," those data points are "linked to

3    a Meta Pixel ID and are processed like web events sent via Pixel."[26]  As with the Facebook Tracking

4    Pixel, the Conversions API intercepts these communications contemporaneously and surreptitiously.

5    [27]  Facebook "recommend[s] that advertisers implement the Conversions API alongside their Meta

6    Pixel and follow other best practices."[28]

7        35.    Facebook confirms, in its "Meta Business Tools Terms,"[29] that it has the capability

8    to use information it collects for purposes other than recording it and conveying it to Defendant.  For

9    instance, Facebook can use the information it collects "to promote safety and security on and off the

10   Meta Products, for research and development purposes and to maintain the integrity of and to provide

11   and improve the Meta Products.  In other words, Facebook can use the wiretapped information for

12   its own "research and development," and well as to "protect" its own products and services.

13       36.    Facebook can also connect all information it collects to analyze and generate reports

14   regarding advertising campaigns, create custom audience sets that can be shared with other

15   advertisers, and "use your Event Data for ads delivery only after aggregating such Event Data with

16   other data collected from other advertisers or otherwise collected on Meta Products."[30]

17       37.    Further, Facebook can use the event data to help websites like Defendant's "reach

18   people with transactional and other commercial messages on [Facebook] Messenger and other Meta

19   Products."[31]

20       38.    Finally, Facebook can use the information it collects "to personalize the features and

---

[25] *Id.*

[26] *Id.*

[27] FACEBOOK, HANDLING DUPLICATE PIXEL AND CONVERSIONS API EVENTS, https://
developers.facebook.com/docs/marketing-api/conversions-api/deduplicate-pixel-and-server-events/
("Once your event fulfills both conditions, we keep the first one and remove the following one.  If
a server and browser event arrive at approximately the same time (within 15 seconds of each
other), we favor the browser event.").

[28] *Id.*

[29] FACEBOOK, META BUSINESS TOOLS TERMS, https://m.facebook.com/legal/businesstech.

[30] *Id.*

[31] *Id.*

1    content (including ads and recommendations) that we show people on and off our Meta Products."[32]

2         39.    Thus, Facebook has the capability to use the information it wiretaps for purposes other

3    than simply providing a recording to Defendant, including but not limited to its own contact

4    information matching; measurement and analytics services; ad targeting; commercial and

5    transactional messages; ad delivery improvement; feature and content personalization; and product

6    improvement, provision, and securement.

7         **B.    Defendant Enables Facebook, through the Meta Pixel, to
8              Wiretap Californians**

9              **1.    Facebook, As Enabled By Defendant, Intercepts
                   Californians' Communications**

10        40.    Defendant owns and operates the Website.  Defendant has integrated the Facebook

11   Tracking Pixel into the Website.

12        41.    On the Website, Website users can, *inter alia*, browse and book Hard Rock hotels.

13   When doing so, Website users provide Defendant with confidential information.

14        42.    This includes "guest records" identifying Website users as Hard Rock guests,

15   boarders, occupants, lodgers, customers, or invitees (*i.e.*, name, address, telephone number, credit

16   card number, email address, ZIP code, and user-specific values contained in Facebook cookies, as

17   described *infra*).

18        43.    Unbeknownst to Plaintiff and Class Members, however, Defendant aids, agrees with,

19   employs, or otherwise enables Facebook to eavesdrop on those confidential communications using

20   Facebook's Business Tools.

21        44.    Website users' confidential communications are the product of Website users

22   affirmatively entering, and interacting with, information on the Website (*i.e.*, the confidential

23   communications are not procedurally or automatically generated).  Instead, as set out below, the

24   confidential communications stem from Website users typing into data fields, conveying responses

25   to questions and prompts, and actively making other selections.  All of the foregoing is information

26   created through the intent of Website users: information created by and in response to Website users'

27   ───────────────
     [32] *Id.*

28

communicative inputs; information created by and in response to Website users' intended messages to the Website and Defendant; and information created by and in response to Website users' having conveyed and expressed their respective desires that the Website would supply them with certain, highly personalized, types of information and/or responses.

45.    Website users may browse and book Hard Rock hotel rooms.  To do so, they select the destination to which they wish to travel, the desired dates for their trip, the number of rooms they require, and the number of adults and children who will be traveling.  Facebook, as enabled by Defendant, contemporaneously intercepts Website users' text entry and button clicks selecting such items—using the Facebook Tracking Pixel:



id: 328420684540923

ev: SubscribedButtonClick

dl: https://hardrockatlanticcityreservations.com/ibe/index.aspx?propertyid=16557&rooms=1&adults=3&children=1&checkin=02/20/2024&checkout=02/21/2024&adobe_mc=MCMID%3D5062169658096856951300881309357025 6518|MCORGID%3D1C1238B352785AA60A490D4C%2540AdobeOrg|TS%3D1708301540&WT.mc_id=brand_bookingwidget

rl: https://hardrockatlanticcityreservations.com/IBE/DelegAuth/shrssMember/callback?hotelGroupCode=HR4

if: false

ts: 1708301622564

cd[buttonFeatures]: {"classList":"ws-element","destination":"https://hardrockatlanticcityreservations.com/ibe/index.aspx?propertyid=16557&rooms=1&adults=3&children=1&checkin=02/20/2024&checkout=02/21/2024&adobe_mc=MCMID%3D50621696580968569513008 81309357025 6518|MCORGID%3D1C1238B352785AA60A490D4C%2540AdobeOrg|TS%3D1708301540&WT.mc_id=brand_bookingwidget#","id":"txOccupants","imageUrl":"","innerText":"OCCUPANCY\n1 Room, 3 Adults, 1 Child","numChildButtons":0,"tag":"a","type":null,"name":""}

cd[buttonText]: OCCUPANCY0 Room, 0 Adults, 0 Child

cd[formFeatures]: [{"id":"cbRooms","name":"cbRooms","tag":"select"},{"id":"cbAdults","name":"","tag":"select"},{"id":"cbChild1","name":"","tag":"select"},{"id":"txGroup","name":"","tag":"input","inputType":"text","valueMeaning":"empty"},{"id":"txIata","name":"txIata","tag":"input","inputType":"text","valueMeaning":"empty"},{"id":"buUpdateResults","name":"buUpdateResults","tag":"input","inputType":"button"},{"id":"hgID","name":"hgID","tag":"input","inputType":"hidden","valueMeaning":"empty"},{"id":"hdOccChanged","name":"hdOccChanged","tag":"input","inputType":"hidden"}]

cd[pageFeatures]: {"title":"Index - Hard Rock Atlantic City"}

cd[parameters]: []

sw: 1280

46.     Facebook, as enabled by Defendant, contemporaneously intercepts a considerable number of other details regarding Website users and their stays.  This includes, for example, details regarding the particular hotel tower that a Website user has selected on the Website for their stay:



id: 847657206274993

ev: SubscribedButtonClick

dl: https://hardrockatlanticcityreservations.com/ibe/index.aspx?propertyid=16557&rooms=1&adults=3&children=1&checkin=02/20/2024&checkout=02/21/2024&adobe_mc=MCMID%3D506216965809685695130088130935702565518|MCORGID%3D1C1238B352785AA60A490D4C%2540AdobeOrg|TS%3D1708301540&WT.mc_id=brand_bookingwidget

rl: https://hardrockatlanticcityreservations.com/IBE/DelegAuth/shrssMember/callback?hotelGroupCode=HR4

if: false

ts: 1708301627798

cd[buttonFeatures]: {"classList":"buildCol sel","destination":"","id":"dalBtn","imageUrl":"//cdn.shrglobal.com/CrsMedia/P16557/bbe/south-tower.jpg.small.jpg","innerText":"SOUTH TOWER","numChildButtons":1,"tag":"div","type":null}

cd[buttonText]: SOUTH TOWER

cd[formFeatures]: []

cd[pageFeatures]: {"title":"Index - Hard Rock Atlantic City"}

sw: 1280

sh: 720

v: 2.9.147

r: stable

ec: 16

o: 4126

fbp: fb.1.1708301543942.1311887638

cdl: API_unavailable

47. As users progress through the Website's booking process, they visit URLs pertaining to their selections (i.e., desired hotel, number of guests, etc.). Facebook, as enabled by Defendant, contemporaneously intercepts the URL of these webpages visited by Website users—containing the foregoing and/or other information—using the Facebook Tracking Pixel. Facebook also, as enabled by Defendant, contemporaneously intercepts when Website users have progressed to and through Hard Rock's checkout page, which requires affirmative button presses on the part of Website users:

id: 2128217010548032
ev: ViewContent
dl: https://www.hardrockhotels.com/
rl:
if: false
ts: 1708207773673
sw: 1280
sh: 720
v: 2.9.147
ec: 1
o: 4126
fbp: fb.1.1708203665647.689291822

id: 328420684540923
ev: PageView
dl: https://hardrockatlanticcityreservations.com/ibe/index.aspx?propertyid=16557&rooms=1&adults=3&children=1&checkin=02/20/2024&checkout=02/21/2024&adobe_mc=MCMID%3D50621696580968569513008813093570256518|MCORGID%3D1C1238B352785AA60A490O4C%2540AdobeOrg|TS%3D1708302946&WT.mc_id=brand_bookingwidget
rl:
if: false
ts: 1708302958680
sw: 1280
sh: 720
v: 2.9.147
ec: 0
o: 4126
fbp: fb.1.1708301543942.1311887638
ler: empty

▾Query String Parameters     view source     view URL-encoded
id: 2128217010548032
ev: PageView
dl: https://hardrockatlanticcityreservations.com/ibe/cart.aspx?hotelID=16557&lang=en-us&currID=0
rl:
if: false
ts: 1708303095060
sw: 1280
sh: 720
v: 2.9.147
ec: 0
o: 4126
fbp: fb.1.1708301543942.1311887638
ler: empty

id: 2128217010548032
ev: PageView
dl: https://hardrockatlanticcityreservations.com/ibe/checkout.aspx?hotelID=16557&lang=en-us&hgID=0&currID=1
rl: https://hardrockatlanticcityreservations.com/ibe/cart.aspx?hotelID=16557&lang=en-us&currID=0
if: false
ts: 1708303137979
sw: 1280
sh: 720
v: 2.9.147
ec: 0
o: 4126
fbp: fb.1.1708301543942.1311887638
ler: empty

48.    On the Website's checkout page, Facebook, as enabled by Defendant, contemporaneously intercepts users' names, email address, phone numbers, and/or room-related selections, using the Facebook Tracking Pixel:



cd[buttonFeatures]: {"classList":"","destination":"https://hardrockatlanticcityreservations.com/ibe/checkout.aspx?hotelID=16557&lang=en-us&hgID=0&currID=1&ws-cost-detail","id":"buTabDetails","imageUrl":"","innerText":"DETAILS","numChildButtons":0,"tag":"a","type":null,"name":""}

cd[buttonText]: DETAILS

cd[formFeatures]: [{"id":"__VIEWSTATE","name":"__VIEWSTATE","tag":"input","inputType":"hidden"},{"id":"__VIEWSTATEGENERATOR","name":"__VIEWSTATEGENERATOR","tag":"input","inputType":"hidden"},{"id":"txEmail","name":"txEmail","tag":"input","inputType":"text","valueMeaning":"empty"},{"id":"txRetypeEmail","name":"txRetypeEmail","tag":"input","inputType":"text","valueMeaning":"empty"},{"id":"chOptIn","name":"chOptIn","tag":"input","inputType":"checkbox"},{"id":"txNewPassword","name":"txNewPassword","tag":"input","inputType":"password","valueMeaning":"empty"},{"id":"txPasswordVerify","name":"txPasswordVerify","tag":"input","inputType":"password","valueMeaning":"empty"},{"id":"cbSalutation","name":"cbSalutation","tag":"select","valueMeaning":"empty"},{"id":"txFirstName","name":"txFirstName","tag":"input","inputType":"text","valueMeaning":"empty"},{"id":"txMiddleInit","name":"txMiddleInit","tag":"input","inputType":"text","valueMeaning":"empty"},{"id":"txLastName","name":"txLastName","tag":"input","inputType":"text","valueMeaning":"empty"},{"id":"txAddress1","name":"txAddress1","tag":"input","inputType":"text","valueMeaning":"empty"},{"id":"txAddress2","name":"txAddress2","tag":"input","inputType":"text","valueMeaning":"empty"},{"id":"txCity","name":"txCity","tag":"input","inputType":"text","valueMeaning":"empty"},{"id":"txZip","name":"txZip","tag":"input","inputType":"text","valueMeaning":"empty"},{"id":"cbCountry","name":"cbCountry","tag":"select","valueMeaning":"empty"},{"id":"txState","name":"txState","tag":"input","inputType":"text","valueMeaning":"empty"},{"id":"cbState","name":"cbState","tag":"select","valueMeaning":"empty"},{"id":"txCompany","name":"txCompany","tag":"input","inputType":"text","valueMeaning":"empty"},{"id":"cbGender","name":"cbGender","tag":"select","valueMeaning":"empty"},{"id":"cbBirthMM","name":"cbBirthMM","tag":"select","valueMeaning":"empty"},{"id":"cbBirthDD","name":"cbBirthDD","tag":"select","valueMeaning":"empty"},{"id":"cbBirthYY","name":"cbBirthYY","tag":"select","valueMeaning":"empty"},{"id":"txMemberID","name":"txMemberID","tag":"input","inputType":"text","valueMeaning":"empty"},{"id":"txPhone","name":"txPhone","tag":"input","inputType":"tel","valueMeaning":"empty"},{"id":"txMobile","name":"txMobile","tag":"input","inputType":"tel","valueMeaning":"empty"},{"id":"chkOptInMobile","name":"chkOptInMobile","tag":"input","inputType":"checkbox"},{"id":"txEmailAlt","name":"txEmailAlt","tag":"input","inputType":"text","valueMeaning":"empty"},{"id":"txBooked","name":"txBooked","tag":"input","inputType":"text","valueMeaning":"empty"},{"id":"cbTripPurpose","name":"cbTripPurpose","tag":"select","valueMeaning":"empty"},{"id":"cbTravelProgram","name":"cbTravelProgram","tag":"select","valueMeaning":"empty"},{"id":"txTravelMember","name":"txTravelMember","tag":"input","inputType":"text","valueMeaning":"empty"},{"id":"cbArrTime","name":"cbArrTime","tag":"select","valueMeaning":"empty"},{"id":"txComments","name":"txComments","tag":"textarea","valueMeaning":"empty"},{"id":"chkNoGuestEmail","name":"chkNoGuestEmail","tag":"input","inputType":"checkbox"},{"id":"inFreedompayToken","name":"inFreedompayToken","tag":"input","inputType":"hidden","valueMeaning":"empty"},{"id":"inFreedompayWithout3DS","name":"inFreedompayWithout3DS","tag":"input","inputType":"hidden","valueMeaning":"empty"},{"id":"rbCreditCard","name":"rdPayMethodType","tag":"input","inputType":"radio"},{"id":"txCardNumber","name":"txCardNumber","tag":"input","inputType":"number","valueMeaning":"empty"},{"id":"cbCardMM","name":"cbCardMM","tag":"select","valueMeaning":"empty"},{"id":"cbCardYY","name":"cbCardYY","tag":"select","valueMeaning":"empty"},{"id":"txCardCvv","name":"txCardCvv","tag":"input","inputType":"number","valueMeaning":"empty"},{"id":"chkBillDiff","name":"chkBillDiff","tag":"input","inputType":"checkbox"},{"id":"cbBillCountry","name":"cbBillCountry","tag":"select","valueMeaning":"empty"},{"id":"cbBillState","name":"cbBillState","tag":"select","valueMeaning":"empty"},{"id":"buReserve2","name":"buReserve2","tag":"input","inputType":"submit"},{"id":"hdToken","name":"hdToken","tag":"input","inputType":"hidden","valueMeaning":"empty"},{"id":"hdBrainTreenonce","name":"hdBrainTreenonce","tag":"input","inputType":"hidden","valueMeaning":"empty"},{"id":"hdLoyaltySignUpPayment","name":"hdLoyaltySignUpPayment","tag":"input","inputType":"hidden","valueMeaning":"empty"},{"id":"hdPaygateWithoutCustomUIEnabled","name":"hdPaygateWithoutCustomUIEnabled","tag":"input","inputType":"hidden"},{"id":"IsFloatBranding","name":"IsFloatBranding","tag":"input","inputType":"hidden"},{"id":"hdReserve","name":"hdReserve","tag":"input","inputType":"submit"},{"id":"hdReserveButtonText","name":"hdReserveButtonText","tag":"input","inputType":"hidden"},{"id":"inSaved","name":"inSaved","tag":"input","inputType":"hidden","valueMeaning":"empty"},{"id":"hdIsBraintreeClicked","name":"hdIsBraintreeClicked","tag":"input","inputType":"hidden","valueMeaning":"empty"},{"id":"hdSignInClicked","name":"hdSignInClicked","tag":"input","inputType":"hidden","valueMeaning":"empty"},{"id":"hdSignUpAlready","name":"hdSignUpAlready","","tag":"input","inputType":"hidden"},{"id":"hdSignUpClicked","name":"hdSignUpClicked","tag":"input","inputType":"hidden"}]

cd[pageFeatures]: {"title":"Checkout - Hard Rock Atlantic City"}

cd[parameters]: []

    **2.**    <u>**Defendant Enables Facebook to Pair Event Data with a
User's Identity**</u>

49.    Along with the foregoing, Facebook's Pixels—as enabled by Defendant—pair event data with a user's Facebook ID.

50.    When a user accesses the Website while logged into Facebook, the Pixel will compel that user's browser to transmit the c_user cookie, which contains the user's unencrypted Facebook ID.  When accessing the Website, Facebook received the following cookies, including the c_user cookie[33]:

| Name | Value | Domain |
|---|---|---|
| datr | ██████████████ | .facebook.com |
| dpr | ████████ | .facebook.com |
| wd | ████ | .facebook.com |
| sb | ██████████ | .facebook.com |
| c_user | ███████ | .facebook.com |
| ps_n | 0 | .facebook.com |
| fr | ████████████ | .facebook.com |
| xs | ████████████ | .facebook.com |
| presence | ██████████ | .facebook.com |
| _fbp | fb.1.1708297919100.1288803498 | .hardrockhotels.com |

51.    When a Website visitor's browser has recently logged out of an account, Facebook compels the visitor's browser to send a smaller set of cookies[34]:

| Name | Value | Domain |
|---|---|---|
| datr | ██████████████ | .facebook.com |
| dpr | ████████ | .facebook.com |
| wd | ████ | .facebook.com |
| sb | ██████████ | .facebook.com |
| ps_n | 0 | .facebook.com |
| fr | ████████████ | .facebook.com |
| _fbp | fb.1.1708297919100.1288803498 | .hardrockhotels.com |

---

[33] Pictured here also is the _fbp cookie, which is sent as a first-party cookie.

[34] Pictured here also is the _fbp cookie, which is sent as a first-party cookie.

52.     No matter the circumstances, Facebook receives at least one cookie from a Website visitor's browser:

| Name | Value | Domain ▲ |
|------|-------|----------|
| ps_n | 0 | .facebook.c... |
| fr | ██████████████ | .facebook.c... |
| _fbp | fb.1.170830467179... | .hardrockh... |
| | | |
| | | |

53.     The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[35] The _fbp cookie contains, at least, an unencrypted value that uniquely identifies a browser. [36]   The datr cookies also identifies a browser.    Facebook, at a minimum, uses the fr and _fbp cookies to identify users.[37]

54.     The fr cookie expires after ninety days unless the visitor's browser logs back into Facebook.[38]  If that happens, the timer resets and another ninety days begins to accrue.[39]

55.     The _fbp cookie expires after ninety days unless the visitor's browser accesses the same website.[40]  If that happens, the time resets, and another ninety days begins to accrue.[41]

---

[35] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012),  http://www.europe-v-facebook.org/ODPC_Review.pdf.

[36] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[37] *Id.*

[38] *Id.*

[39] Confirmable through developer tools.

[40] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[41] Also confirmable through developer tools.

56.     The Facebook Tracking Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, the Website.[42]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[43]  The _fbp cookie is always transmitted as a first-party cookie.  A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

57.     Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

58.     Defendant uses these cookies to pair event data with personally identifiable information so it can later retarget consumers on Facebook.

59.     Defendant also uses "Advanced Matching."  With Advanced Matching, Defendant's Pixels "look for recognizable form field and other sources on your website that contain information such as first name, last name and email."[44]  That information is recorded, "along with the event, or action, that took place."[45]  This information is also "hashed,"[46] meaning it is "[a] computed summary of digital data that is a one-way process." In other words, it "cannot be reversed back into the original data."[47]

> You can use Advanced Matching to help:
>
> - Increase the number of attributed conversions. We can match more of the conversions that happen on your website to people on Meta. This helps you understand the impact of your ads on website conversions.
>
> - Increase your Custom Audience size. We're able to better match your website visitors to people on Meta and increase the size of your Custom Audience.
>
> - Decrease the cost per conversion. Conversion-optimized campaigns become more efficient because we can better identify and deliver ads to the types of people likely to take the actions you care about.

---

[42] PC MAGAZINE, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie.  This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[43] *Id.*  This is also confirmable by tracking network activity.

[44] FACEBOOK, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668?id=1205376682832142.

[45] *Id.*

[46] DEFINITION OF HASH, https://www.pcmag.com/encyclopedia/term/hash.

[47] *Id.*

60.     Defendant discloses this information to Facebook so it can better match visitors to their Facebook profiles.

61.     As part of Advanced Matching, Defendant enabled "Automatic Advanced Matching." That means Defendant configured the pixel to scan form fields containing a user's email address, first name, last name, phone number, gender, zip code, city and state.[48] The highlighted line shows that Defendant enabled Automatic Matching.

```
73          fbq.loadPlugin("iwlbootstrapper");
74          instance.optIn("2128217010548032", "IWLBootstrapper", true);
75          fbq.loadPlugin("iwlparameters");
76          instance.optIn("2128217010548032", "IWLParameters", true);
77          fbq.set("iwlExtractors", "2128217010548032", []);
78          fbq.loadPlugin("cookie");
79          instance.optIn("2128217010548032", "FirstPartyCookies", true);
80          fbq.loadPlugin("inferredevents");
81          instance.optIn("2128217010548032", "InferredEvents", true);
82          fbq.loadPlugin("automaticmatchingforpartnerintegrations");
83          instance.optIn("2128217010548032", "AutomaticMatchingForPartnerIntegrations", true);
84          config.set(null, "batching", {
-               "batchWaitTimeMs": 501,
-               "maxBatchSize": 10
```

62.     Defendant knows that Facebook will match the Advanced Matching parameters with a customer's subsequent activity, thereby helping Defendant "[i]ncrease the number of attributed conversions," "[i]ncrease [their] Custom Audience size," and "[d]ecrease the cost per conversion."[49]

63.     By compelling a visitor's browser to disclose the Advanced Matching parameters and event data for videos, Defendant knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's website activity, including what webpages they visit and what items they view and purchase.

**3.     Defendant Never Received Users' Consent to Disclose their Confidential Communications to Facebook**

64.     To summarize the above allegations, Facebook, as enabled by Defendant, collects the contents of Californians' communications with the Website using the Facebook Tracking Pixel. These communications include, but are not limited to, "guest records." *See* Statement of Facts §

---

[48] Facebook provides a corresponding look-up table: FACEBOOK, ADVANCED MATCHING, https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching.

[49] FACEBOOK, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668?id=1205376682832142.

III.B.1-2, *supra*.  This is information that is affirmatively entered by users in the Website.  *Id*.  This information is not anonymized because (i) Facebook collects users' email addresses, and (ii) Defendant enables Facebook to link users' communications with their Facebook IDs, which reveal their identities.  *See* Statement of Facts § III.B.1-2, *supra*.

65.     Crucially, neither Defendant nor Facebook procure prior consent from Californians for Facebook to engage in this wiretapping.

66.     Hard Rock's "Terms of Use" merely state: "In the course of your use of our Website, you may be asked to provide certain personal information to us (such information referred to hereinafter as 'Personal Information').  Our information collection and use policies with respect to the privacy of such Personal Information are set forth in the Website's Privacy Policy which is incorporated herein by reference for all purposes."[50]  This "Privacy Policy" reads: "We use automated devices and applications, such as Google Analytics, to evaluate usage of our Website. We also may use other analytic means to evaluate our services. . . . These entities may use cookies and other tracking technologies to perform their services. We do not share your personal information with these third parties."[51]  But, as set out *supra* and *infra*, Defendant *does* allow for the collection of users' personal information, including by Facebook, even when it has not received consent from Website users to do so.

67.     And Defendant's "Cookies Settings" show that "Strictly Necessary Cookies"; "Performance Cookies"; Functional Cookies"; and "Targeting Cookies" are turned on by default, even before a Website user selects "Accept" or "Confirm."  Nonetheless, Defendant expressly represents that it will refrain from collecting personally identifiable information ("cookies[] information . . . does not usually directly identify you[.] . . . Because we respect your right to privacy, you can choose not to allow some types of cookies.").  Further, Defendant represents that "Targeting Cookies" like the Facebook Pixel "do not store directly personal information, but are based on uniquely identifying your browser and internet device.'"

---

[50] Hard Rock Hotel, Terms of Use, https://www.hardrockhotels.com/terms.aspx.

[51] Hard Rock Hotel, Privacy Policy, https://www.hardrockhotels.com/privacy.aspx.



68.     As courts across the country have recognized, however, the identifiers that the Facebook Pixel captures—Facebook ID, email address, first name, last name, and phone number—constitute "directly personal information."  By capturing this information anyway, Defendant fails to receive consent from visitors to intercept their communications.

69.     Likewise, Facebook never receives consent from Website users to intercept and collect electronic communications containing their sensitive and unlawfully disclosed information. In fact, Facebook expressly warrants the opposite.

70.     When first signing up for Facebook, a user assents to three agreements: the Facebook Terms of Service,[52] the Cookies Policy,[53] and the Data Policy.[54]  For California residents, Facebook also publishes a California Privacy Policy.[55]

71.      Facebook's Terms of Service begins by stating that "[p]rotecting people's privacy is

---

[52] FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update.

[53] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policies/cookies/.

[54] FACEBOOK, DATA POLICY, https://www.facebook.com/about/privacy/update.

[55] FACEBOOK, CALIFORNIA PRIVACY NOTICE, https://www.facebook.com/legal/policy/ccpa.

central to how we've designed our ad system."[56]  The Terms of Service then prohibits anyone from using Facebook's Products in a manner that is "unlawful, misleading, discriminatory or fraudulent."[57]

72.     Facebook's Data Policy recognizes that there may be "[d]ata with special protections,"  meaning information that "could be subject to special protections under the laws of your country."[58]  The Data Policy goes on to describe how Facebook collects information from its "Meta Business Tools," including "our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Meta pixel."[59]  Specifically, Facebook acknowledges that "[p]artners receive your data when you visit or use their services or through third parties they work with."[60]

73.     Facebook then offers an express representation: "*We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us*."[61]  Facebook does acknowledge collecting "data with special protections" to personalize ads, but critically, only sensitive information that users "choose to provide."[62]

74.     Facebook's Cookies Policy ratifies those representations, stating "the Data Policy will apply to our processing of the data that we collect via cookies."[63]

75.     For California residents, Facebook reiterates that policy: "We require each of these partners to have rights to collect, use, and share your data before providing any data to us."[64]  The California Privacy Policy also restrict Facebook's ability to collect "data with special protections," stating they do so only when users "choose to provide it."[65]

---

[56]FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update..

[57] *Id.*

[58] FACEBOOK, DATA POLICY, https://www.facebook.com/about/privacy/update.

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policies/cookies/.

[64] FACEBOOK, CALIFORNIA PRIVACY NOTICE, https://www.facebook.com/legal/policy/ccpa.

[65] *Id.*

76.     Facebook's other representations reinforce these warranties.   In its Advertising Policy, Facebook states "[w]e do not use sensitive personal data for ad targeting."[66]   And in a blog post titled "About Restricted Meta Business Tools Data," Facebook asserts it has "policies around the kinds of information businesses can share with us."[67]   Facebook does not "want websites or apps sending us sensitive information about people."[68]   Sensitive information includes, among other things, "any information defined as sensitive under applicable laws, regulations and applicable industry guidelines."[69]

77.     These representations are repeated frequently.   Facebook created a "Help Center" to better explain its practices to users.   In an article titled, "How does Facebook receive information from other businesses and organizations?," Facebook reiterates its promise to "prohibit businesses or organizations from sharing sensitive information with us," and if Facebook "determine[s] that a business or an organization is violating our terms, we'll take action against that business or organization."[70]   In another article, titled, "How does Meta work with data providers?," Facebook repeats this promise, stating "[b]usinesses that advertise on Facebook are required to have any necessary rights and permissions to use this information, as outlined in our Custom Audience Terms that businesses must agree to."[71]

78.     A reasonable user who reads Facebook's terms and representations would understand those terms as requiring Facebook to enforce an advertiser's compliance with its terms.   At a minimum, those terms and representations require Facebook to build safeguards for sensitive information.   No reasonable user would read those terms and representations as permitting Facebook to intentionally intercept electronic communications that it knows the law protects and deems

---

[66] FACEBOOK, ADVERTISING POLICY, https://www.facebook.com/policies/ads/.

[67] FACEBOOK, ABOUT RESTRICTED META BUSINESS TOOLS DATA, https://www.facebook.com/ business/help/1057016521436966?id=188852726110565.

[68] *Id.*

[69] *Id.*

[70] FACEBOOK, HOW DOES FACEBOOK RECEIVE INFORMATION FROM OTHER BUSINESSES AND ORGANIZATIONS, https://www.facebook.com/help/2230503797265156.

[71] HOW DOES META WORK WITH DATA PROVIDERS?, https://www.facebook.com/help/494750870625830?ref=dp.

---

sensitive.  And no user, reasonable or not, could read those terms as allowing Facebook to aid and abet another party's disclosure of such protected and sensitive information.  In short, Facebook never receives consent from users to intentionally intercept and monetize electronic communications disclosing sensitive information that the law protects.

<strong><u>CLASS ALLEGATIONS</u></strong>

79.     Plaintiff seeks certification of the following class: all California residents who have a Facebook account and accessed and navigated the Website while in California (the "Class").

80.     Plaintiff reserves the right to modify the Class definition, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

81.     **<u>Numerosity</u>:** The Class is composed of at least thousands of individuals, the joinder of which in one action would be impracticable.  The disposition of their claims through this class action will benefit both the parties and the Court.

82.     **<u>Existence and Predominance of Common Questions of Fact and Law</u>:** There is a well-defined community of interest in the questions of law and fact involved affecting the members of the proposed Class.  The questions of law and fact common to the proposed Class predominate over questions affecting only individual class members.  Such questions include, but are not limited to, the following: whether Defendant violated CIPA §§ 631 and 632 and whether Plaintiff and the proposed Class members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

83.     **<u>Typicality</u>:** The claims of the named Plaintiff are typical of the claims of the Class because Plaintiff, like all other class members, visited the Website and had their confidential electronic communications intercepted and disclosed to Facebook.

84.     **<u>Adequacy</u>:** Plaintiff is an adequate representative of the Class because their interests do not conflict with the interests of the Class they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and their counsel.

85.     **<u>Superiority</u>:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class. Each individual Class Member may lack the

resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.  Finally, Defendant has acted or refused to act on grounds generally applicable to the entire Class, thereby making it appropriate for this Court to grant final injunctive relief and declaratory relief with respect to the Class as a whole.

## **CAUSES OF ACTION**

### **COUNT I**
#### **Violation Of The California Invasion Of Privacy Act,**
#### **Cal. Penal Code § 631(a)**

86.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

87.    Plaintiff brings this claim against Defendant individually and on behalf of the Class.

88.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978).  Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any

wire, line or cable or is being sent from or received at any place within this state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

89.     CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email.  *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

90.     Facebook's Business Tools, including but not limited to the Facebook Pixel, are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

91.     Facebook "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021).  Further, Facebook had the capability to use the wiretapped information for its own purposes.  Accordingly, Facebook was a third party to any communication between Plaintiff and Class Members, on the one hand, and Defendant, on the other.  *Id*. at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

92.     At all relevant times, by its Business Tools, Facebook willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and Class Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

93.     At all relevant times, Facebook used or attempted to use the communications intercepted by its Business Tools to promote and improve its advertising platform.

94.     At all relevant times, Defendant aided, agreed with, employed, permitted, or otherwise enabled Facebook to wiretap Plaintiff and Class Members using the Business Tools and to accomplish the wrongful conduct at issue here.

95.     Plaintiff and Class Members did not provide their prior consent to Facebook's intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and Class Members' electronic communications.  Nor did Plaintiff and Class Members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling Facebook's conduct.

96.     The wiretapping of Plaintiff and Class Members occurred in California, where Plaintiff and Class Members accessed the Website and where Facebook—as enabled by Defendant—routed Plaintiff's and Class Members' electronic communications its servers.

97.     Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

### COUNT II
**Violation Of The California Invasion Of Privacy Act,
Cal. Penal Code § 632**

98.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

99.     Plaintiff brings this claim against Defendant individually and on behalf of the Class.

100.    CIPA § 632(a) prohibits an entity from:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

101.    Facebook's Business Tools, including but not limited to the Facebook Pixel, are "electronic amplifying or recording device[s]."

102.   Cal. Civ. Code § 53.5(a) states:

[A]n innkeeper, hotelkeeper, motelkeeper, lodginghouse keeper, or owner or operator of an inn, hotel, motel, lodginghouse, or other similar accommodations, or any employee or agent thereof, who offers or accepts payment for rooms, sleeping accommodations, or board and lodging, or other similar accommodation, shall not disclose, produce, provide, release, transfer, disseminate, or otherwise communicate, except to a California peace officer, all or any part of a guest record orally, in writing, or by electronic or any other means to a third party without a court-issued subpoena, warrant, or order.

103.   Per Cal. Civil Code § 53.5(c):

"Guest record" for purposes of this section includes any record that identifies an individual guest, boarder, occupant, lodger, customer, or invitee, including, but not limited to, their name, social security number or other unique identifying number, date of birth, location of birth, address, telephone number, driver's license number, other official form of identification, credit card number, or automobile license plate number.

104.   Accordingly, any communication that "identifies an individual" Website visitor qualifies as "confidential communication[]" under California law.  Specifically, the following pieces of information provided by Plaintiff and Class Members to the Website constitute "confidential communications": name, address, telephone number, credit card number, email address, ZIP code, user-specific values contained in Facebook cookies as described *supra*, and any other piece of information identifying Website users as Hard Rock guests, boarders, occupants, lodgers, customers, or invitees.

105.   At all relevant times, Facebook intentionally used its Business Tools to eavesdrop upon and record the confidential communications of Plaintiff and Class Members, on the one hand, and Defendant, on the other.

106.   When communicating with Defendant, Plaintiff and Class Members had an objectively reasonable expectation of privacy, based on Cal. Civil Code § 53.5.  Thus, Plaintiff and Class Members did not reasonably expect that anyone other than Defendant would be on the other end of the communication, and that other, third-party entities like Facebook, would intentionally use

1  an electronic amplifying or recording device to eavesdrop upon and record the confidential
2  communications of Plaintiff and Class Members.

3        107.    Plaintiff and Class Members did not consent to any of Facebook's actions. Nor have
4  Plaintiff or Class Members consented to Facebook's intentional use of an electronic amplifying or
5  recording device to eavesdrop upon and record the confidential communications of Plaintiff and
6  Class Members.

7        108.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured
8  by Defendant's violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of
9  Defendant's violations of CIPA § 632(a).

10                            **PRAYER FOR RELIEF**

11        WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks
12  judgment against Defendant, as follows:

    (a)    For an order certifying the Class, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

    (b)    For an order declaring that Defendant's conduct violates the statute referenced herein;

    (c)    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

    (d)    For actual, compensatory, statutory, and/or punitive in amounts to be determined by the Court and/or jury;

    (e)    For prejudgment interest on all amounts awarded;

    (f)    For an order of restitution and all other forms of equitable monetary relief;

    (g)    For injunctive relief as pleaded or as the Court may deem proper; and

    (h)    For an order awarding Plaintiff and the Class their reasonable attorneys' fees, expenses, and costs of suit.

                            **JURY TRIAL DEMAND**

    Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated:  March 4, 2024

Respectfully submitted,

**BURSOR & FISHER, P.A**.

By:_____
        Brittany S. Scott

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Brittany S. Scott (State Bar No. 327132)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
              bscott@bursor.com

*Attorneys for Plaintiff*

**EXHIBIT A**

## Your activity off Meta technologies

Your activity from the businesses and organizations you visit off of Meta

Generated by Christina King on Thursday, February 22, 2024 at 12:00 PM UTC-08:00

Contains data from February 22, 2023 at 11:56 AM to February 22, 2024 at 11:56 AM

---

### Activity received from hardrockhotelsacramento.com

---

| ID | 318715958810997 |
|----|-----------------|

| Event | PAGE_VIEW |
|-------|-----------|

Received on

June 6, 2023 at 12:27 PM

| ID | 182594407122366 |
|----|-----------------|

| Event | PAGE_VIEW |
|-------|-----------|

Received on

March 29, 2023 at 9:24 PM

| ID | 318715958810997 |
|----|-----------------|

| Event | PAGE_VIEW |
|-------|-----------|

Received on

March 29, 2023 at 9:24 PM

| ID | 328420684540923 |
|----|-----------------|

| Event | PAGE_VIEW |
|-------|-----------|

Received on

March 29, 2023 at 9:24 PM

| ID | 2128217010548032 |
|----|------------------|

| Event | PAGE_VIEW |
|-------|-----------|

Received on

March 29, 2023 at 9:24 PM

---