1
2   **BURSOR & FISHER, P.A.**
    Philip L. Fraietta (State Bar No. 354768)
3   1330 Avenue of the Americas, 32nd Floor
    New York, NY 10019
4   Telephone: (646)-837-7150
    Facsimile: (212) 989-9163
5   Email: pfraietta@bursor.com

6   **BURSOR & FISHER, P.A.**
    Stefan Bogdanovich (State Bar No. 324525)
7   1990 North California Blvd., 9th Floor
    Walnut Creek, CA 94596
8   Telephone: (925) 300-4455
    Facsimile:  (925) 407-2700
9   E-mail: sbogdanovich@bursor.com

10  *Attorneys for Plaintiff*

11                  **UNITED STATES DISTRICT COURT**

12                  **EASTERN DISTRICT OF CALIFORNIA**

13

14  CHRISTINA KING, individually and on behalf    Case No. 2:24-cv-01119-DC-CKD
    of all others similarly situated,
15
                              Plaintiff,    **SECOND AMENDED CLASS ACTION**
16                                          **COMPLAINT**

17         v.
                                            **DEMAND FOR JURY TRIAL**
18  HARD ROCK CAFE INTERNATIONAL
    (USA), INC.,
19
                              Defendant.
20

21

22                          **REDACTED VERSION**

23

24

25

26

27

28

---

1    Plaintiff Christina King files this class action complaint on behalf of herself and all others

2    similarly situated (the "Class Members") against Hard Rock Cafe International (USA), Inc.

3    ("Defendant" or "Hard Rock").  Plaintiff brings this action based upon personal knowledge of the

4    facts pertaining to herself, and on information and belief as to all other matters, by and through the

5    investigation of undersigned counsel.

6                                    **NATURE OF THE ACTION**

7    1.    This is a class action lawsuit brought on behalf of all California residents who have

8    accessed and used hotel.hardrock.com (formerly hardrockhotels.com) and its subsidiary pages,

9    formatted as [hotel].reservations.hardrock.com (formerly hardrockhotel[destination].com) (the

10   "Website"), a website that Defendant owns and operates.

11   2.    Defendant aids, employs, agrees with, or otherwise enables a third party, Meta

12   Platforms, Inc. ("Meta"), to eavesdrop on communications sent and received by Plaintiff and Class

13   Members, including communications that contain sensitive and confidential information (i.e., "guest

14   records," as defined by Cal. Civil Code § 53.5.  By failing to procure consent before enabling

15   Facebook's interception of these communications, Defendant violated the California Invasion of

16   Privacy Act ("CIPA") §§ 631-632.

17                                          **PARTIES**

18   3.    Plaintiff Christina King is a resident and citizen of Sacramento, California.  In or

19   around 2010, Plaintiff King created a Facebook account.  Several times, including on or around

20   October 5, 2023 and January 12, 2024, Plaintiff King visited the Website operated by Defendant

21   (specifically, the subsidiary page hardrockhotelsacramento.com), on the same browser that she used

22   to access Facebook.  Plaintiff King was in California when she visited the Website.  Upon accessing

23   the Website, as alleged in greater detail below, Plaintiff King browsed and booked a Hard Rock

24   hotel.  Each of these communications was intercepted in transit by Meta – as enabled by Defendant

25   – including communications that contained Plaintiff King's confidential "guest records," as defined

26   by Cal. Civil Code § 53.5.  Neither Defendant nor Meta procured Plaintiff King's prior consent to

27   this interception.

28

1    4.    Defendant Hard Rock Cafe International (USA), Inc. is a Florida corporation with its

2    principal place of business at 5701 Stirling Road, Davie, Florida, 33314.  Defendant does business

3    across the nation and operates several hotels throughout California.[1]

4                              **JURISDICTION AND VENUE**

5    5.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

6    1332(d) because this is a class action where there are more than 100 members and the aggregate

7    amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least

8    one member of the putative Class is a citizen of a state different from Defendant.

9    6.    The Court has personal jurisdiction over Defendant because Defendant has

10   purposefully availed itself of the laws and benefits of doing business in California, and Plaintiff's

11   claims arise out of Defendant's forum-related activities.  Plaintiff accessed and navigated the

12   Website while in California, and Defendant assisted Facebook with intercepting Plaintiff's

13   communications in this District.

14   7.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial

15   portion of the events giving rise to this action occurred in this District.

16                              **FACTUAL ALLEGATIONS**

17   **I.    The California Invasion of Privacy Act**

18   8.    The California Legislature enacted the Invasion of Privacy Act to protect certain

19   privacy rights of California citizens.  The legislature expressly recognized that "the development of

20   new devices and techniques for the purpose of eavesdropping upon private communications … has

21   created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and

22   civilized society."  Cal. Penal Code § 630.

23   9.    The California Supreme Court has repeatedly stated an "express objective" of CIPA

24   is to "protect a person placing or receiving a call from a situation where the person on the other end

25   of the line *permits an outsider to tap his telephone or listen in on the call*." *Ribas v. Clark*, 38 Cal.

26   3d 355, 364 (1985) (emphasis added)

27

28   [1] HARD ROCK, OUR DESTINATIONS, https://hotel.hardrock.com/destinations.aspx.

10.     Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (emphasis added; internal citations omitted).

11.     As part of CIPA, the California Legislature enacted § 631(a), which prohibits any person or entity from [i] "intentionally tap[ping], or mak[ing] any unauthorized connection … with any telegraph or telephone wire," [ii] "willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any … communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]," or [iii] "us[ing], or attempt[ing] to use … any information so obtained."

12.     CIPA § 631(a) also penalizes [iv] those who "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

13.     As part of the Invasion of Privacy Act, the California Legislature additionally introduced Penal Code § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

14.     A "confidential communication" for the purposes of CIPA § 632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto."  Cal. Penal Code § 632(c).

15.     Individuals may bring an action against the violator of CIPA §§ 631 and 632 for $5,000 per violation.  Cal. Penal Code § 637.2(a)(1).  Plaintiff does so, here, against Defendant.

## II.    California Civil Code § 53.5

16.    As the California Legislature recognized, a "guest record" maintained by an owner or operator of an inn, hotel, motel, lodginghouse, or other similar accommodations is confidential.  Such an owner or operator "shall not disclose, produce, provide, release, transfer, disseminate, or otherwise communicate, except to a California peace officer, all or any part of a guest record orally, in writing, or by electronic or any other means to a third party without a court-issued subpoena, warrant, or order."  Cal. Civil Code § 53.5(a).

17.    Per Cal. Civil Code § 53.5(c):

> "Guest record" for purposes of this section includes any record that identifies an individual guest, boarder, occupant, lodger, customer, or invitee, including, but not limited to, their name, social security number or other unique identifying number, date of birth, location of birth, address, telephone number, driver's license number, other official form of identification, credit card number, or automobile license plate number.

18.    Further, the legislative history of § 53.5 indicates:

> (a) In 1972, California voters amended the California Constitution to include the right of privacy among the "inalienable" rights of all people. The amendment established a legal and enforceable right of privacy for every Californian. Fundamental to this right of privacy is the ability of individuals to control the use of their personal information.

> (b) Since California voters approved the right of privacy, the California Legislature has adopted specific mechanisms to safeguard consumer privacy, including the California Consumer Privacy Act of 2018, the Online Privacy Protection Act, the Reader Privacy Act, the Privacy Rights for California Minors in the Digital World Act, and Shine the Light, a California law intended to give Californians the 'who, what, where, and when' of how businesses handle consumers' personal information.

> (c) Californians frequently have to disclose their sensitive personal information to third parties in order to accomplish routine activities: apply for a job; apply for housing; raise a child; drive a car or take transportation; or stay at a hotel or motel.

> (d) California law has not kept pace with these developments and the personal privacy implications surrounding the collection, use, and protection of personal information by third parties.

> (e) Many businesses collect personal information from California consumers. They may know where a consumer lives, how many children a

consumer has, where a consumer lives and works, where a consumer travels and where they stay on their trip, how fast a consumer drives, a consumer's personality, sleep habits, biometric and health information, financial information, precise geolocation information, and social networks, to name a few categories.

(f) The unauthorized disclosure of personal information and the loss of privacy can have devastating effects for individuals, including financial fraud, identity theft, unnecessary costs to personal time and finances, destruction of property, harassment, reputational damage, emotional stress, and even potential physical harm.

(g) When Californians leave their homes to travel via bus or stay at lodging establishments throughout their state, they desire assurances that these businesses will respect their privacy and safeguard their personal information from improper disclosure.

(h) Protecting the privacy of personal information promotes consumer confidence and encourages both residents and visitors to travel to and within California and to patronize California businesses.

(i) Therefore, it is the intent of the Legislature to further Californians' right to privacy by ensuring that the personal information disclosed by patrons of lodging establishments and bus companies is used for the intended business purposes and not improperly disclosed.

California S.B. 1194 (September 27, 2018).[2]

19.     Here, Website users' communications with Hard Rock – made while browsing and booking Hard Rock hotels via the Website – contain sensitive and confidential "guest records," as defined by Cal. Civil Code § 53.5.

20.     First, the communications include "record[s] that identif[y] an individual[.]"  Cal. Civil Code § 53.5(c).  As described *infra*, Defendant enables Meta to identify individual Website users by their respective Facebook accounts, utilizing several cookies, including the c_user; datr; fr; and _fbp cookies.  These pieces of data collected by Meta constitute "record[s] that identif[y] an individual" (Cal. Civil Code § 53.5(c)), as the cookies at issue contain "unique identifying number[s]" assigned to Website users.  *Id.*

21.     Website users' communications with Hard Rock also "identif[y] an individual [as a

---

[2] https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB1194.

Hard Rock] guest, boarder, occupant, lodger, customer, or invitee[.]" *Id.* Meta intercepts Website users' selections of the destination to which they wish to travel, the desired dates for their trip, the numbers of adults and children who will be traveling, their room type upgrades, and the particular hotel area in which they wish to stay. Meta intercepts button clicks and the URLs of webpages visited by Website users, which contain the foregoing communications. Meta also intercepts when users progress through and complete a booking on the Website. These communications "identif[y] an individual [as a Hard Rock] guest, boarder, occupant, lodger, customer, or invitee" (Cal. Civil Code § 53.5(c)) because they show that all Website users are "invitees" of Hard Rock – individuals with "express or implied invitation to enter or use [Hard Rock's] premises."[3] These communications also identify certain Website users (those who complete the booking process) as Hard Rock hotel "guests" and "customers."

22.     Thus, Meta – as aided by Defendant – intercepted "guest records," which are confidential, under Cal. Civil Code § 53.5. Moreover, Meta is not a legitimate "third-party service provider," as defined by Cal. Civil Code § 53.5(f), because Meta is not "an entity contracted to provide services outlined in [a] contract [with Hard Rock] that has no independent right to use or share the data beyond the terms of the contract." Rather, Meta has the capability to use the information it wiretaps for purposes other than simply providing a recording to Defendant. *See infra,* § VII. Therefore, Defendant's conduct here at issue was not permitted by, *inter alia,* Cal. Civil Code § 53.5(i).

**III.     Overview of Defendant's Website**

23.     Defendant owns and operates the Website. Defendant has integrated Meta's wiretaps into the Website.

24.     On the Website, Website users can, *inter alia,* browse and book Hard Rock hotels. When doing so, Website users provide Defendant with confidential information, including "guest records" under Cal. Civil Code § 53.5. *See supra* § II.

25.     Unbeknownst to Plaintiff and Class Members, however, Defendant aids, agrees with,

---

[3] INVITEE, Black's Law Dictionary (11th ed. 2019).

1    employs, or otherwise enables Meta to eavesdrop on those confidential communications using

2    Meta's wiretaps, as set out *infra*.

3        26.    Website users' confidential communications are the product of Website users

4    affirmatively entering, and interacting with, information on the Website (*i.e.*, the confidential

5    communications are not procedurally or automatically generated).  Instead, as set out below, the

6    confidential communications stem from Website users typing into data fields, conveying responses

7    to questions and prompts, and actively making other selections.  All of the foregoing is information

8    created through the intent of Website users: information created by and in response to Website users'

9    communicative inputs; information created by and in response to Website users' intended messages

10   to the Website and Defendant; and information created by and in response to Website users' having

11   conveyed and expressed their respective desires that the Website would supply them with certain,

12   highly personalized, types of information and/or responses.

13       27.    Website users may browse and book Hard Rock hotel rooms.  To do so, users type

14   and/or select from a list the destination to which they wish to travel. Next, users click the dates for

15   their trip, and the number of adults and children who will be traveling.  Meta, as enabled by

16   Defendant, contemporaneously intercepts Website users' selections of such items:



**Website "Screen 1"**

26       28.    Then, Website users pick the hotel area (i.e., north tower, south tower, etc.) and type

27   of room (i.e., double, queen, king bed, etc.) in which they wish to stay.  After making their

28   selection, Website users add their chosen room to their cart.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Website "Screen 2A"**



**Website "Screen 2B"**

29.    Website users subsequently select room type upgrades (i.e., queen bed, king bed, non-smoking, etc.) and click to continue to the checkout screen.

**Website "Screen 3"**

30. Next, Website users check out by typing their personal information (first and last name, email, phone number) and entering their payment information.



**Website "Screen 4"**

31.    Finally, upon checking out, Website users review a page confirming their reservation.



**Website "Screen 5"**

## IV.    Overview of Meta's Tracking Technologies

### A.    Background

32.    Meta wiretaps the Website with its tracking technologies, which Defendant purposefully installed on the Website.

33.    Meta's tracking technologies send secret instructions to a Website user's browser, without alerting the individual that this is happening.  The trackers then cause the browser to secretly and simultaneously duplicate the user's Website communications, transmitting these communications to Meta's servers alongside additional information about the Website user's

identity. This entire process occurs within milliseconds. In other words, when a user communicates with Defendant's Website, those communications are simultaneously and contemporaneously duplicated and sent to Meta at the same time as they are being sent to Defendant. Thus, Meta's interception of these communications occurs "in transit." *See, e.g.*, *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020) ("Permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion…"); *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019) ("Even if the browser caused a parallel signal to be sent to NaviStone, that intervention happened while the signal was already in transit from Revitch's device. Section 631's protections extend explicitly to the beginnings and ends of communications…"); *James v. Walt Disney Co.*, 710 F. Supp. 3d 942, 961-62 (N.D. Cal. 2023) (finding in-transit interception was alleged based on similar process to the one alleged herein).

**B.    The Meta Tracking Pixel**

34.    Meta wiretaps the Website with trackers associated with the "Meta Pixel."[4] According to Meta, "[t]he Meta Pixel is a snippet of JavaScript code that allows [clients] to track visitor activity on [their] website[s]. It works by loading a small library of functions which [] can [be] use[d] whenever a site visitor takes an action (called an event) that [a client] want[s] to track (called a conversion)."[5] Meta offers a menu of "standard events" that can be tracked, including what content a visitor views or purchases.[6] Advertisers can also create their own tracking parameters by building a "custom event."[7] Thus, the Meta Pixel helps "understand[] the actions people take on [a] website."[8]

---

[4] META, META PIXEL, https://developers.facebook.com/docs/meta-pixel.

[5] *Id.*

[6] META, SPECIFICATIONS FOR META PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655. *See also* META, STANDARD EVENTS, https://developers.facebook.com/docs/meta-pixel/reference.

[7] META, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005; *see also* META, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[8] *Id.*

35.    The Meta Pixel "relies on Facebook cookies, which enable [Meta] to match [] website visitors to their respective Facebook User accounts."[9]   Additionally, "[w]ith advanced matching, [website operators] can send [Meta] hashed customer information along with [] Meta Pixel events, which can help … match more of the conversions that happen on your website to people on Meta."[10]

36.    This is highly useful for marketing and advertising.  Specifically, the Meta Pixel can be used to help "measure ad effectiveness"; "define custom audiences for ad targeting"; and support "Advantage+ catalog ads campaigns[.]"[11]

37.    With respect to measuring ad effectiveness, "[t]rack[ing ] website visitors' actions[,] also known as conversion tracking[,] ... can be used to … calculate [] return[s] on ad investment[s]."[12] "In [the] Meta Ads Manager, [website operators] can see how many conversions happened as a result of [their] Meta ads."[13]   This includes "cross-device reporting, which lets [advertisers] see cross-device conversions across apps and the web (for example, if a customer sees an ad for a product on their mobile phone, but decides to buy it later on their desktop computer)."[14]

38.    A "custom audience is an ad targeting option"[15] that can be used by advertisers, like Defendant, "to find people most likely to respond to [their] ad[s]."[16]   Clients can "[c]reate [an] online audience based on the traits of who [they] want to see [their] ad[s], and narrow down [their] ad[s'] audience[s] by interests, gender or location and use ad targeting to find the people most likely to take action.   Once [an] ad starts running, [Meta's] system will learn who is engaging with it and, over

---

[9] META, META PIXEL GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.

[10] META, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668?id=1205376682832142.

[11] META, META PIXEL, https://developers.facebook.com/docs/meta-pixel.

[12] META, CONVERSION TRACKING, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking.

[13] META, USE CONVERSION TRACKING TO MEASURE RESULTS, https://www.facebook.com/business/help/339239069606476.

[14] *Id.*

[15] META, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227.

[16] META, AUDIENCE AD TARGETING, https://www.facebook.com/business/ads/ad-targeting.

1  time, narrow [the] audience [to help] reach more of the right people."[17]  Advertisers can target, *inter*

2  *alia*, "[n]ew customers with specific interests or from a specific location"; "[p]eople who have

3  already shown an interest in [a client's] business"; and "[p]eople who share interests with [a client's]

4  current customers[]" (i.e., "Lookalike Audience[s]").[18]

5       39.    "Advantage+ catalog ads are dynamically created by populating an ad template with

6  product information found in a data feed. This allows [Meta clients] to create thousands of ads

7  without having to configure each of them individually."[19]  Clients "can also use Advantage+ catalog

8  ads to target visitors based on how they have interacted with [their] website in the past."[20]

**V.    Defendant Aids, Agrees with, Employs, or Otherwise Enables Meta to Wiretap Californians' Communications**

11      40.    Meta, as enabled by Defendant, contemporaneously intercepts the following

12  Website communications.

| id | 847657206274993 |
|---|---|
| ev | Search |
| dl | https://atlantic-city.reservations.hardrock.com/ibe/index.aspx?propertyid=165578&rooms=1&adults=1&checkin=US3L17/2026&checkout=03/18/2026&adobe_mc=MCMID%3D001143622961048257335677310851525158O|MCORGID%3D1C1238B352785AA60A490D4C%2540AdobeOrg|TS%3D1749496797798&WT.mc_id=brand_bookingwidget |
| rl | https://atlantic-city.reservations.hardrock.com/ibe/DelegAuth/shrssMember/callback?hotelGroupCode=HR4 |
| if | false |
| ts | 1749496786229 |
| cd[content_ids] | hra |
| cd[content_type] | casino |
| cd[country] | united states |
| cd[content_name] | hard rock atlantic city |
| sw | 1920 |
| sh | 1080 |
| v | 2.9.205 |
| r | stable |
| ec | 2 |
| o | 12318 |
| fbp | fb.1.1749496723864.875904255921105131 |

---

[17] *Id.*

[18] *Id.*

[19] Meta, Meta Pixel for Advantage+ Catalog Ads, https://developers.facebook.com/docs/meta-pixel/get-started/advantage-catalog-ads.

[20] *Id.*

41.    As shown by the red highlight in the above excerpts of the Website's transmissions, Meta intercepts the destination selected by users (here, "atlantic-city"; "hard rock atlantic city"). As shown by the yellow highlights, Meta intercepts the desired trip dates selected by users (here, "checkin=03/17/2026&checkout=03/18/2026"). As shown by the green highlights, Meta intercepts the numbers of rooms and guests selected by users (here, "rooms=1&adults=1"). These communications are the product of button clicks on Website Screen 1.

| id | 847657206274993 |
|---|---|
| ev | SubscribedButtonClick |
| dl | https://atlantic-city.reservations.hardrock.com/ibe/index.aspx?propertyid=16557&rooms=1&adults=1&checkin=03/17/2026&checkout=03/18/2026&adobe_mc=MCMID%3D0011436229610482573356777310851525 1580\|MCORGID%3D1C12388352785AA60A490D4C%2540AdobeOrg\|TS%3D1749496779&WT.mc_id=brand_bookingwidget |
| rl | https://atlantic-city.reservations.hardrock.com/ibe/DelegAuth/shrssMember/callback?hotelGroupCode=HR4 |
| if | false |
| ts | 1749496787119 |
| cd[buttonFeatures] | {"classList":"buildFilt","destination":"javascript:","id":"","imageUrl":"//cdn.shrglobal.com/CrsMedia/P16557/bbe/south-tower.jpg.small.jpg","innerText":"SOUTH TOWER","numChildButtons":0,"tag":"a","type":null,"name":""} |
| cd[buttonText] | SOUTH TOWER |

| id | 847657206274993 |
|---|---|
| ev | SubscribedButtonClick |
| dl | https://atlantic-city.reservations.hardrock.com/ibe/index.aspx?propertyid=16557&rooms=1&adults=1&checkin=03/17/2026&checkout=03/18/2026&adobe_mc=MCMID%3D0011436229610482573356777310851525 1580\|MCORGID%3D1C12388352785AA60A490D4C%2540AdobeOrg\|TS%3D1749496779&WT.mc_id=brand_bookingwidget |
| rl | https://atlantic-city.reservations.hardrock.com/ibe/DelegAuth/shrssMember/callback?hotelGroupCode=HR4 |
| if | false |
| ts | 1749496801772 |
| cd[buttonFeatures] | {"classList":"ws-button-small ws-tagNew ws-primary","destination":"https://atlantic-city.reservations.hardrock.com/ibe/index.aspx?propertyid=16557&rooms=1&adults=1&checkin=03/17/2026&checkout=03/18/2026&adobe_mc=MCMID%3D0011436229610482573356777310851525 1580\|MCORGID%3D1C12388352785AA60A490D4C%2540AdobeOrg\|TS%3D1749496779&WT.mc_id=brand_bookingwidget#","id":"","imageUrl":"","innerText":"BOOK NOW","numChildButtons":0,"tag":"a","type":"5","name":""} |
| cd[buttonText] | BOOK NOW |

| id | 847657206274993 |
|---|---|
| ev | SubscribedButtonClick |
| dl | https://atlantic-city.reservations.hardrock.com/ibe/index.aspx?propertyid=16557&rooms=1&adults=1&checkin=03/17/2026&checkout=03/18/2026&adobe_mc=MCMID%3D0011436229610482573356777310851525 1580\|MCORGID%3D1C12388352785AA60A490D4C%2540AdobeOrg\|TS%3D1749496779&WT.mc_id=brand_bookingwidget |
| rl | https://atlantic-city.reservations.hardrock.com/ibe/DelegAuth/shrssMember/callback?hotelGroupCode=HR4 |
| if | false |
| ts | 1749496805516 |
| cd[buttonFeatures] | {"classList":"ws-button ws-primary","destination":"","id":"buWsCartCart","imageUrl":"","innerText":"CART","numChildButtons":0,"tag":"a","type":null,"name":""} |
| cd[buttonText] | CART |

42.    As shown by the orange highlights in the above excerpts of the Website's transmissions, Meta intercepts miscellaneous other selections by users, such as picking the hotel area in which they wish to stay, choosing to book a room now, and adding a room to their cart (here, "SOUTH TOWER"; "BOOK NOW"; "CART").  These communications are the product of button clicks on Website Screens 2A ("SOUTH TOWER"; "BOOK NOW") and 2B ("CART").

| id | 847657206274993 |
|---|---|
| ev | SubscribedButtonClick |
| dl | https://atlantic-city.reservations.hardrock.com/ibe/cart.aspx?hotelID=16557&lang=en-us&hgID=0&currID=1 |
| rl | https://atlantic-city.reservations.hardrock.com/ibe/index.aspx?propertyid=16557&rooms=1&adults=1&checkin=03/17/2026&checkout=03/18/2026&adobe_mc=MCMID%3D00114362296104825733567773108515251580\|MCORGID%3D1C1238B352785AA60A490D4C%2540AdobeOrg\|TS%3D1749496779&WT.mc_id=brand_bookingwidget |
| if | false |
| ts | 1749496816711 |
| cd[buttonFeatures] | {"classList":"","destination":"https://atlantic-city.reservations.hardrock.com/ibe/cart.aspx?hotelID=16557&lang=en-us&hgID=0&currID=1#","id":"","imageUrl":"","innerText":"North Tower Classic King Non-Smoking\nAdd $0 per night","numChildButtons":0,"tag":"a","type":null,"name":""} |
| cd[buttonText] | North Tower Classic King Non-Smoking<br>Add $0 per night |
| cd[formFeatures] | [] |
| cd[pageFeatures] | {"title":"Cart - Hard Rock Atlantic City"} |
| cd[parameters] | [] |
| sw | 1920 |
| sh | 1080 |
| v | 2.9.205 |
| r | stable |
| ec | 1 |
| o | 12318 |
| fbp | fb.1.1749496723864.875904255921105131 |

| id | 847657206274993 |
|---|---|
| ev | SubscribedButtonClick |
| dl | https://atlantic-city.reservations.hardrock.com/ibe/cart.aspx?hotelID=16557&lang=en-us&hgID=0&currID=1 |
| rl | https://atlantic-city.reservations.hardrock.com/ibe/cart.aspx?hotelID=16557&lang=en-us&hgID=0&currID=1 |
| if | false |
| ts | 1749496836484 |
| cd[buttonFeatures] | {"classList":"ws-button ws-primary","destination":"https://atlantic-city.reservations.hardrock.com/ibe/cart.aspx?hotelID=16557&lang=en-us&hgID=0&currID=1#","id":"buCheckout","imageUrl":"","innerText":"CHECKOUT","numChildButtons":0,"tag":"a","type":null,"name":""} |
| cd[buttonText] | CHECKOUT |

43.    As shown by the brown highlights in the above excerpt of the Website's transmissions, Meta intercepts the room type upgrades selected by users (here, "North Tower Classic King Non-Smoking").  As shown by the orange highlight, Meta intercepts when a user chooses to check out (here, "CHECKOUT").  These communications are the product of button clicks on Website Screen 3.

| | |
|---|---|
| id | 847657206274993 |
| ev | InitiateCheckout |
| dl | https://atlantic-city.reservations.hardrock.com/ibe/checkout.aspx?hotelID=16557&lang=en-us&hgID=0&currID=1 |
| rl | https://atlantic-city.reservations.hardrock.com/ibe/cart.aspx?hotelID=16557&lang=en-us&hgID=0&currID=1 |
| if | false |
| ts | 1749496844872 |
| cd[content_ids] | hra |
| cd[currency] | usd |
| cd[num_items] | 0 |
| cd[value] | 152.51 |
| cd[content_type] | casino |
| cd[country] | united states |
| cd[content_name] | hard rock atlantic city |
| cd[checkin_date] | 2026-03-17 |
| cd[checkout_date] | 2026-03-18 |
| cd[num_children] | 0 |
| cd[num_adults] | 1 |
| cd[num_guests] | 1 |
| sw | 1920 |
| sh | 1080 |
| v | 2.9.205 |
| r | stable |
| ec | 0 |
| o | 12318 |
| fbp | fb.1.1749496723864.875904255921105131 |

| | |
|---|---|
| id | 847657206274993 |
| ev | AddPaymentInfo |
| dl | https://atlantic-city.reservations.hardrock.com/ibe/checkout.aspx?hotelID=16557&lang=en-us&hgID=0&currID=1 |
| rl | https://atlantic-city.reservations.hardrock.com/ibe/cart.aspx?hotelID=16557&lang=en-us&hgID=0&currID=1 |
| if | false |
| ts | 1749496940853 |
| cd[content_ids] | hra |
| cd[currency] | usd |
| cd[value] | 152.51 |
| cd[content_type] | casino |
| cd[country] | united states |
| cd[content_name] | hard rock atlantic city |
| cd[checkin_date] | 2026-03-17 |
| cd[checkout_date] | 2026-03-18 |
| cd[num_children] | 0 |
| cd[num_adults] | 1 |
| cd[num_guests] | 1 |
| sw | 1920 |
| sh | 1080 |
| v | 2.9.205 |
| r | stable |
| ec | 2 |
| o | 12318 |
| fbp | fb.1.1749496723864.875904255921105131 |

| id | 847657206274993 |
| ev | SubscribedButtonClick |
| dl | https://atlantic-city.reservations.hardrock.com/ibe/checkout.aspx?hotelID=16557&lang=en-us&hgID=0&currID=1 |
| rl | https://atlantic-city.reservations.hardrock.com/ibe/cart.aspx?hotelID=16557&lang=en-us&hgID=0&currID=1 |
| if | false |
| ts | 1749496967529 |
| cd[buttonFeatures] | {"classList":"ws-button ws-primary ws-bottom-reserveBtn ws-reserve-button","destination":"https://atlantic-city.reservations.hardrock.com/ibe/checkout.aspx?hotelID=16557&lang=en-us&hgID=0&currID=1","id":"buReserve2","imageUrl":"","innerText":"","numChildButtons":0,"tag":"input","type":"submit","name":"buReserve2","value":"Reserve"} |
| cd[buttonText] | |
| cd[formFeatures] | [{"id":"__VIEWSTATE","name":"__VIEWSTATE","tag":"input","inputType":"hidden"},{"id":"__VIEWSTATEGENERATOR","name":"__VIEWSTATEGENERATOR","tag":"input","inputType":"hidden"},{"id":"txEmail","name":"txEmail","tag":"input","inputType":"text"},{"id":"txRetypeEmail","name":"txRetypeEmail","tag":"input","inputType":"text","valueMeaning":"empty"},{"id":"chOptin","name":"chOptin","tag":"input","inputType":"checkbox"},{"id":"txNewPassword","name":"txNewPassword","tag":"input","inputType":"password","valueMeaning":"empty"},{"id":"txPasswordVerify","name":"txPasswordVerify","tag":"input","inputType":"password","valueMeaning":"empty"},{"id":"cbSalutation","name":"cbSalutation","tag":"select","valueMeaning":"empty"},{"id":"txFirstName","name":"txFirstName","tag":"input","inputType":"text"},{"id":"txMiddleInit","name":"txMiddleInit","tag":"input","inputType":"text","valueMeaning":"empty"},{"id":"txLastName","name":"txLastName","tag":"input","inputType":"text"},{"id":"txAddress1","name":"txAddress1","tag":"input","inputType":"text"},{"id":"txAddress2","name":"txAddress2","tag":"input","inputType":"text","valueMeaning":"empty"},{"id":"txCity","name":"txCity","tag":"input","inputType":"text"},{"id":"txZip","name":"txZip","tag":"input","inputType":"text"},{"id":"cbCountry","name":"cbCountry","tag":"select"},{"id":"txState","name":"txState","tag":"input","inputType":"text","valueMeaning":"empty"},{"id":"cbState","name":"cbState","tag":"select"},{"id":"txCompany","name":"txCompany","tag":"input","inputType":"text","valueMeaning":"empty"},{"id":"cbGender","name":"cbGender","tag":"select","valueMeaning":"empty"},{"id":"cbBirthMM","name":"cbBirthMM","tag":"select","valueMeaning":"empty"},{"id":"cbBirthDD","name":"cbBirthDD","tag":"select","valueMeaning":"empty"},{"id":"cbBirthYY","name":"cbBirthYY","tag":"select","valueMeaning":"empty"},{"id":"txMemberID","name":"txMemberID","tag":"input","inputType":"text","valueMeaning":"empty"},{"id":"txPhone","name":"txPhone","tag":"input","inputType":"tel"},{"id":"txMobile","name":"txMobile","tag":"input","inputType":"tel","valueMeaning":"empty"},{"id":"chkOptinMobile","name":"chkOptinMobile","tag":"input","inputType":"checkbox"},{"id":"txEmailAlt","name":"txEmailAlt","tag":"input","inputType":"text","valueMeaning":"empty"},{"id":"txBooked","name":"txBooked","tag":"input","inputType":"text","valueMeaning":"empty"},{"id":"cbTripPurpose","name":"cbTripPurpose","tag":"select","valueMeaning":"empty"},{"id":"cbTravelProgram","name":"cbTravelProgram","tag":"select","valueMeaning":"empty"},{"id":"txTravelMember","name":"txTravelMember","tag":"input","inputType":"text","valueMeaning":"empty"},{"id":"cbArrTime","name":"cbArrTime","tag":"select"},{"id":"txComments","name":"txComments","tag":"textarea","valueMeaning":"empty"},{"id":"TranspAddGuestCount","name":"TranspAddGuestCount","tag":"input","inputType":"hidden"},{"id":"chkNoGuestEmail","name":"chkNoGuestEmail","tag":"input","inputType":"checkbox"},{"id":"inFreedompayToken","name":"inFreedompayToken","tag":"input","inputType":"hidden","valueMeaning":"empty"},{"id":"inFreedompayWithout3DS","name":"inFreedompayWithout3DS","tag":"input","inputType":"hidden","valueMeaning":"empty"},{"id":"rbCreditCard","name":"rdPayMethodType","tag":"input","inputType":"radio"},{"id":"txCardNumber","name":"txCardNumber","tag":"input","inputType":"number"},{"id":"cbCardMM","name":"cbCardMM","tag":"select"},{"id":"cbCardYY","name":"cbCardYY","tag":"select"},{"id":"txCardCvv","name":"txCardCvv","tag":"input","inputType":"number"},{"id":"chkBillDiff","name":"chkBillDiff","tag":"input","inputType":"checkbox"},{"id":"cbBillCountry","name":"cbBillCountry","tag":"select"},{"id":"cbBillState","name":"cbBillState","tag":"select","valueMeaning":"empty"},{"id":"hdToken","name":"hdToken","tag":"input","inputType":"hidden","valueMeaning":"empty"},{"id":"hdBrainTreenonce","name":"hdBrainTreenonce","tag":"input","inputType":"hidden","valueMeaning":"empty"},{"id":"hdLoyaltySignUpPayment","name":"hdLoyaltySignUpPayment","tag":"input","inputType":"hidden","valueMeaning":"empty"},{"id":"hdPaygateWithoutCustomUIEnabled","name":"hdPaygateWithoutCustomUIEnabled","tag":"input","inputType":"hidden"},{"id":"IsFloatBranding","name":"IsFloatBranding","tag":"input","inputType":"hidden"},{"id":"buReserve","name":"buReserve","tag":"input","inputType":"submit"},{"id":"hidReserveButtonText","name":"hidReserveButtonText","tag":"input","inputType":"hidden","valueMeaning":"empty"},{"id":"inSaved","name":"inSaved","tag":"input","inputType":"hidden","valueMeaning":"empty"},{"id":"hdIsBraintreeClicked","name":"hdIsBraintreeClicked","tag":"input","inputType":"hidden","valueMeaning":"empty"},{"id":"hdSignUpAlready","name":"","tag":"input","inputType":"hidden"},{"id":"hdSignInClicked","name":"","tag":"input","inputType":"hidden"}] |
| cd[pageFeatures] | {"title":"Checkout - Hard Rock Atlantic City"} |
| cd[parameters] | [] |
| sw | 1920 |
| sh | 1080 |
| v | 2.9.205 |
| r | stable |
| ec | 3 |
| o | 13342 |
| fbp | fb.1.1749496723864.875904255921105131 |

44.     As shown by the tan highlights in the above excerpts of the Website's transmissions, Meta intercepts the URL of Website Screen 4, indicating that Website users have accessed the checkout page (here, in pertinent part, "atlantic-city.reservations.hardrock.com/ibe/

checkout.aspx"). This is corroborated by the "InitiateCheckout" and "AddPaymentInfo" events, highlighted in pink, which denote "[t]he start of a checkout process" and "[a]dding customer payment information during a checkout process[,]"[21] respectively. As shown by the orange highlight, Meta intercepts when a user chooses to reserve their stay (here, "Reserve"). This communication is the product of a button click on Website Screen 4. As shown by the red highlights, Meta intercepts the destination selected by users (here, "hard rock atlantic city"). As shown by the yellow highlights, Meta intercepts the trip dates selected by users (here, "[checkin_date] 2026-03-17" and "[checkout_date] 2026-03-18"). As shown by the green highlights, Meta intercepts the numbers of guests, adults, and children selected by users (here, "[num_guests] 1"; "[num_adults] 1"; "[num_children] 0"). As shown by the teal highlight, this data is transmitted to Meta along with the "fbp event parameter," which contains the "_fbp browser cookie value"[22] (here, "fb.1.1749496723864.875904255921105131").

| id | 847657206274993 |
| ev | Purchase |
| dl | https://atlantic-city.reservations.hardrock.com/ibe/confirm.aspx?hotelID=16557&lang=en-us&currID=1&crsID=L7V4KA7JL7&resvKey=b3ed112eeea0f39a86d5979bd34b4ba771bb752d7f57ce8a63de5b0390efc45b&ret=1 |
| rl | https://atlantic-city.reservations.hardrock.com/ibe/checkout.aspx?hotelID=16557&lang=en-us&hglD=0&currID=1 |
| if | false |
| ts | 1749496979699 |
| cd[content_ids] | hra |
| cd[content_name] | hard rock atlantic city |
| cd[content_type] | casino |
| cd[num_items] | 0 |
| cd[currency] | usd |
| cd[value] | 151.91 |
| cd[country] | united states |
| cd[checkin_date] | 2026-03-17 |
| cd[checkout_date] | 2026-03-18 |
| cd[num_children] | 0 |
| cd[num_adults] | 1 |
| cd[num_guests] | 1 |
| cd[rate_code] | 13BAR |
| sw | 1920 |
| sh | 1080 |
| v | 2.9.205 |
| r | stable |
| ec | 0 |
| o | 12318 |
| fbp | fb.1.1749496723864.875904255921105131 |

[21] META, SPECIFICATIONS FOR META PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[22] META, CLICKID AND THE FBP AND FBC PARAMETERS, https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/fbp-and-fbc.

45.     As shown by the tan highlight in the above excerpt of the Website's transmissions, Meta intercepts the URL of Website Screen 5, indicating that Website users have accessed the reservation confirmation page (here, in pertinent part, "atlantic-city.reservations.hardrock.com/ibe/confirm.aspx").  This is corroborated by the "Purchase" event, highlighted in pink, which denotes "[t]he completion of a purchase[.]"[23]  As shown by the purple highlight, Meta collects a user's confirmation number (here, "L7V4KA7JL7") and reservation key (here, "b3ed112eeea0f39a86d5929bd34b4ba771bb752d7f57ce8e63de5a0390efc45b").  As shown by the red highlight, Meta intercepts the destination booked by users (here, "hard rock atlantic city").  As shown by the yellow highlights, Meta intercepts the trip dates booked by users (here, "[checkin_date] 2026-03-17" and "[checkout_date] 2026-03-18").  As shown by the green highlights, Meta intercepts the numbers of guests, adults, and children booked by users (here, "[num_guests] 1"; "[num_adults] 1"; "[num_children] 0").  As shown by the teal highlight, this data is transmitted to Meta along with the fbp event parameter, which contains the _fbp browser cookie value (here, "fb.1.1749496723864.875904255921105131").

## VI.    Defendant Enables Meta to Pair the Above Data with Users' Identities

46.     As discussed *supra*, § IV, the Meta tracking technologies at issue can pair wiretapped data with website users' identities.

47.     The tracking technologies achieve this, at least in part, through cookies. A cookie is a "small text file (up to 4KB) created by a website that is stored in the user's computer either temporarily for that session only or permanently in storage (persistent cookie)."[24]  Persistent cookies can be used to "track user behavior across different sites. They store information such as geographic location, device specifications, and specific actions taken on the website."[25]

48.     Specifically, through Facebook cookies, Meta can identify individual website users by their respective Facebook accounts.  Through advanced matching, Meta can also identify

---

[23] META, SPECIFICATIONS FOR META PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[24] PC MAGAZINE, COOKIE TABLE, https://www.pcmag.com/encyclopedia/term/cookie.

[25] COOKIEBOT, WHAT ARE TRACKING COOKIES AND HOW DO THEY WORK?, https://www.cookiebot.com/en/tracking-cookies/.

individual website users by the personal information they provide on websites (i.e., name, email address, phone number, etc.).

49.    The following image confirms that, when a user accesses the Website while logged into Facebook, the Meta tracking technologies on the Website compel that user's browser to transmit several cookies, including the c_user; datr; fr; and _fbp[26] cookies:

| Name | Value | Domain |
|------|-------|--------|
| datr | ████████████████ | .facebook.com |
| dpr | █████████ | .facebook.com |
| wd | ██████ | .facebook.com |
| sb | ███████████████ | .facebook.com |
| c_user | ██████████ | .facebook.com |
| ps_n | 0 | .facebook.com |
| fr | ██████████████████ | .facebook.com |
| xs | ██████████████████ | .facebook.com |
| presence | ██████████ | .facebook.com |
| _fbp | fb.1.1708297919100.1288803498 | .hardrockhotels.com |

50.    The c_user cookie contains, at least, the user's unencrypted Facebook ID.[27]  The c_user cookie has a lifespan of three hundred sixty-five days.[28]

51.    The datr cookie contains, at least, a value that uniquely identifies a browser.[29]  The datr cookie has a lifespan of four hundred days.[30]

52.    The fr cookie contains, at least, a value that uniquely identifies a browser and the

---

[26] Note, the Meta Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—i.e., the Website. PC MAGAZINE, FIRST-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/first-party-cookie.  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—i.e., Facebook. PC MAGAZINE, THIRD-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/third-party-cookie. The _fbp cookie is always transmitted as a first-party cookie. A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook. Pictured here and in the infra two images is the _fbp cookie, sent as a first-party cookie.

[27] MICROSOFT, COOKIE COMPLIANCE, https://learn.microsoft.com/en-us/dynamics365/commerce/cookie-compliance ("Cookie[:] c_user[.] Description[:] Cookie contains the user ID of the currently signed-in user.").

[28] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[29] Id. ("'Datr' is a unique identifier for your browser[.]").

[30] Id.

user's encrypted Facebook ID.[31]  The fr has a lifespan of ninety days.[32]

53.    The _fbp cookie contains, at least, a value that uniquely identifies a browser.[33]  The _fbp has a lifespan of ninety days.[34]

54.    When a Website visitor's browser has recently logged out of an account, Facebook compels the visitor's browser to send a smaller set of cookies, including the datr, fr, and _fbp cookies:

| Name | Value | Domain |
|------|-------|--------|
| datr | ███████████████ | .facebook.com |
| dpr | ███████ | .facebook.com |
| wd | █████ | .facebook.com |
| sb | █████████ | .facebook.com |
| ps_n | 0 | .facebook.com |
| fr | █████████████ | .facebook.com |
| _fbp | fb.1.1708297919100.1288803498 | .hardrockhotels.com |

55.    No matter the circumstances, Facebook compels the visitor's browser to transmit the fr and _fbp cookies:

| Name | Value | Domain |
|------|-------|--------|
| ps_n | 0 | .facebook.c... |
| fr | ████████████ | .facebook.c... |
| _fbp | fb.1.170830467179... | .hardrockh... |

---

[31] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012),  http://www.europe-v-facebook.org/ODPC_Review.pdf ("The first part of the cookie is a browser ID, used to identify the web browser. The second part of the cookie is an encrypted version of the logged in user's Facebook ID.").

[32] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[33] Id. ("Cookie[:] _fbp[.] Description[:] These cookies identify browsers for businesses using our Meta Products for the purposes of providing advertising and site analytics services."). See also FACEBOOK, CUSTOMER INFORMATION PARAMETERS, https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/customer-information-parameters#fbp ("The Facebook browser ID value is stored in the _fbp browser cookie[.]").

[34] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

56.    Defendant also uses "Advanced Matching."  With Advanced Matching, Defendant's Meta Pixels "look for recognizable form field and other sources on [the] website that contain information such as first name, last name and email."[35]  That information is recorded, "along with the event, or action, that took place."[36]

57.    Specifically, as part of Advanced Matching, Defendant enabled "Automatic Advanced Matching."  That means Defendant configured the pixel to scan form fields containing a user's email address, first name, last name, phone number, gender, zip code, city and state.[37]  The highlighted line below shows that Defendant enabled Automatic Matching.

```
95          fbq.loadPlugin("cookie");
96          instance.optIn("847657206274993", "FirstPartyCookies", true);
97          fbq.loadPlugin("inferredevents");
98          instance.optIn("847657206274993", "InferredEvents", true);
99          fbq.loadPlugin("automaticmatchingforpartnerintegrations");
100         instance.optIn("847657206274993", "AutomaticMatchingForPartnerIntegrations", true);
101         config.set(null, "batching", {
-               "batchWaitTimeMs": 10,
```

58.    Thus, Meta, as enabled by Defendant, can contemporaneously intercept users' names, email address, phone numbers, and/or other personal details using the Meta Pixel on the Website. Although these personal details are "hashed,"[38] the reality is that, even in hashed form, they are traceable to individuals.[39]

---

[35] META, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668.

[36] Id.

[37] See META, ADVANCED MATCHING, https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching; META, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668.

[38] Id.

[39] See, e.g., FEDERAL TRADE COMMISSION, DOES HASHING MAKE DATA "ANONYMOUS"?, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2012/04/does-hashing-make-data-anonymous ("[H]ashing is vastly overrated as an 'anonymization' technique … the casual assumption that hashing is sufficient to anonymize data is risky at best, and usually wrong."); FEDERAL TRADE COMMISSION, NO, HASHING STILL DOESN'T MAKE YOUR DATA ANONYMOUS, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous ("[H]ashes aren't 'anonymous' and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized."); STEVEN ENGLEHARDT ET AL., I NEVER SIGNED UP FOR THIS! PRIVACY IMPLICATIONS OF EMAIL TRACKING, https://petsymposium.org/2018/files/papers/issue1/paper42-2018-1-source.pdf ("[H]ashing of PII, including emails, is not a meaningful privacy

59.     Defendant discloses this information to Meta so that Meta can better match Website visitors to their Facebook profiles, thereby helping Defendant "[i]ncrease the number of attributed conversions," "[i]ncrease [their] Custom Audience size," and "[d]ecrease the cost per conversion."[40]

**VII.    Meta Uses Californians' Data for their Own Purposes**

60.     When Meta uses its wiretaps on Website users' communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other.  Instead, Meta – a separate and distinct entity from the parties to the conversations – uses the wiretaps to eavesdrop upon, record, extract data from, and analyze conversations to which Meta is not a party.  Meta, itself, collects the contents of said conversations.  That data is then analyzed by Meta before being provided to any entity that was a party to the conversations (like Defendant).

61.     Meta has the capability to use the contents of conversations it collects through its wiretaps for its own purposes.

62.     In its "Meta Business Tools Terms,"[41] Meta confirms that it has the capability to use information it collects for purposes other than recording it and conveying it to Defendant.  For instance, Meta can use the information it collects "to promote safety and security on and off the Meta Products, for research and development purposes and to maintain the integrity of and to provide and improve the Meta Products."[42]  Further, Meta can "disclose [] Campaign Reports or Analytics … to [] third part[ies,] … [if] they have been combined with Campaign Reports and Analytics from numerous other third parties and [the advertiser using the Meta Business Tools has had its] identifying information [] removed from the combined Campaign Reports and Analytics."[43]  And

---

protection. This is folk knowledge in the security community, but bears repeating."); MARTECH, FTC PRIVACYCON: YOUR EMAIL ADDRESS IS LEAKING AND VULNERABLE, https://martech.org/ftc-privacycon-email-address-leaking-vulnerable ("Hashing is an algorithmic process that turns [information] into a gibberish label[.] … Although gibberish, it's unique, so it can be employed as an anonymized identifier. It's supposed to be one-way, meaning that you can't turn the gibberish back into the [original form]. Wrong, says Englehardt and his colleagues.").

[40] META, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668.

[41] META, META BUSINESS TOOLS TERMS, https://m.facebook.com/legal/businesstech.

[42] *Id.*

[43] *Id.*

Meta can use the information it collects to "improve the effectiveness of ad delivery, [] determine the relevance of ads to people[,] … [and] personalize the features and content (including ads and recommendations) that [Meta] show[s] people on and off [] Meta Products."[44]  Thus, Meta has the capability to use the wiretapped data for purposes other than simply providing a recording to Defendant, including, but not limited to, its own research and development; ad delivery; feature and content personalization; and product improvement, provision, and securement.

**VIII.  Defendant Never Received Users' Consent to Disclose their Confidential Communications to the Third Parties**

63.  Crucially, neither Defendant nor Meta procures prior consent from Californians for Meta to engage in this wiretapping.

64.  Nowhere on the Website does Defendant provide notice of its privacy-related practices that is prominently displayed, designed to attract Website users' attention, and distinctive in appearance.

65.  Nowhere on the Website does Defendant adequately disclose the tracking here at issue, including that:

- Meta, as enabled by Defendant, intercepts the contents of Californians' communications on the Website, in real time.

- These communications include, but are not limited to, "guest records," which are affirmatively entered by users on the Website and confidential under Cal. Civil Code § 53.5(c).  Namely, Meta intercepts Website users' button clicks selecting the destination to which they wish to travel, the desired dates for their trip, the number of rooms they require, the numbers of adults and children who will be traveling, and the particular hotel and room type in which they wish to stay.  Meta also intercepts the URL of webpages visited by Website users – containing the foregoing communications.

- This information is not anonymized because Defendant enables Meta to link users' communications with personal information that reveals their identities.  Such personal information includes cookie IDs/the values contained in cookies, which constitute "record[s] that identif[y] an individual[.]"  Cal. Civil Code § 53.5(c).

66.  Nowhere on the Website does Defendant request or receive Website users' affirmative consent *prior to* enabling Meta's tracking technologies.

---

[44] *Id.*

67.    Hard Rock's "Terms of Use" merely state: "In the course of your use of our Website, you may be asked to provide certain personal information to us (such information referred to hereinafter as 'Personal Information'). Our information collection and use policies with respect to the privacy of such Personal Information are set forth in the Website's Privacy Policy which is incorporated herein by reference for all purposes."[45]  This "Privacy Policy" reads: "We use automated devices and applications, such as Google Analytics, to evaluate usage of our Website. We also may use other analytic means to evaluate our services. … These entities may use cookies and other tracking technologies to perform their services. **We do not share your personal information with these third parties**."[46]  But, as set out *supra* and *infra*, Defendant *does* allow for the collection of users' personal information, including by Meta, even though it has not received consent from Website users to do so.

68.    Additionally, for members of the "Unity by Hard Rock Loyalty Program," Hard Rock's "Unity by Hard Rock Loyalty Program Terms and Conditions" merely state: "[T]he collection, use, and disclosure of your information (including your personal information) … will be done in accordance with the Privacy Policy, which can be found at unity.hardrock.com/privacy-policy (the 'Privacy Policy')."[47]  Similarly, the "Unity by Hard Rock Terms of Use" merely state: "Your use of the Site is subject to our Privacy Policy."[48]  This "Unity by Hard Rock Privacy Policy," just like the general Hard Rock "Privacy Policy," reads: "We use automated devices and applications, such as Google Analytics, to evaluate usage of the Program Website, Unity Apps, and our online services. … These devices and applications may use cookies, tracking pixels, and other tracking technologies to perform their functions. **We do not share your Personal Information with these**

---

[45] HARD ROCK HOTEL, TERMS OF USE, https://hotel.hardrock.com/terms.aspx (formerly https://www.hardrockhotels.com/terms.aspx).

[46] HARD ROCK HOTEL, PRIVACY POLICY, https://hotel.hardrock.com/privacy.aspx (formerly https://www.hardrockhotels.com/privacy.aspx) (emphasis added).

[47] HARD ROCK HOTEL, UNITY BY HARD ROCK LOYALTY PROGRAM TERMS AND CONDITIONS, https://unity.hardrock.com/loyalty-rewards-program-terms-and-conditions.

[48] HARD ROCK HOTEL, UNITY BY HARD ROCK TERMS OF USE, https://unity.hardrock.com/terms-of-use.

1    **third parties**."[49]  But, as set out *supra* and *infra*, Defendant *does* allow for the collection of users'

2    personal information, including by Meta, even though it has not received consent from Website users

3    to do so.

4            69.     Making this clear, when a user accesses the Website, Defendant presents them with a

5    "Cookies Banner," stating, *inter alia*: "We use cookies to analyze and enhance the usage of our

6    website ('Performance Cookies') or to provide you with customized content based on the preference

7    you saved on our website ('Functional Cookies') and we may share data with our advertising

8    partners[.]"  This message is difficult to find and difficult to read, as it is buried at the bottom of the

9    Website, in small font.  And the Meta Pixel actively intercepts Website users' communications, even

10   (1) before a Website user indicates, in any way, they have so much as seen (let alone actually read)

11   this "Cookies Banner" message (i.e., by clicking on it or closing it) and (2) after a Website user opts

12   to "Reject All" of Defendant's cookies:



**(1) Meta Pixel, active on the Website even before a Website user engages with the "Cookies Banner"**

[49] HARD ROCK HOTEL, UNITY BY HARD ROCK PRIVACY POLICY,
https://unity.hardrock.com/privacy-policy (emphasis added).

1
2
3
4
5
6
7
8
9
10
11
12
13



**(2) Meta Pixel, active on the Website even after a Website user opts to "Reject All" of Defendant's cookies**

70.      Defendant's "Cookies Settings" show that "Strictly Necessary Cookies"; "Performance Cookies"; Functional Cookies"; and "Targeting Cookies" are indeed turned on by default, even before a Website user selects "Accept" or "Confirm" (or consents to anything at all).

  

71.     Nonetheless, Defendant expressly represents that it will refrain from collecting personally identifiable information ("cookies[] information … does not usually directly identify you[.] … Because we respect your right to privacy, you can choose not to allow some types of cookies.").  Further, Defendant represents that "Targeting Cookies" like the Meta Pixel "do not store directly personal information, but are based on uniquely identifying your browser and internet device."

72.     However, the identifiers that the Meta Pixel captures (*see supra*) constitute "directly personal information."  By capturing this information anyway, Defendant fails to receive consent from visitors to intercept their communications.

73.     Likewise, Meta never receives consent from Defendant's Website users to intercept and collect electronic communications containing their sensitive and unlawfully disclosed information.  In fact, Meta expressly warrants the opposite.

74.     When first signing up for Facebook, a user assents to three agreements: the Meta Terms of Service,[50] Cookies Policy,[51] and Privacy Policy.[52]  For California residents, Meta also publishes a United States Regional Privacy Notice.[53]

75.     Meta's Terms of Service begin by stating that "[p]rotecting people's privacy is central to how we've designed our ad system."[54]  The Terms of Service then prohibit anyone from using Meta's Products in a manner that is "unlawful, misleading, discriminatory or fraudulent[.]"[55]

76.     Meta's Privacy Policy describes how Meta receives information like "[w]ebsites you visit and cookie data, like through Social Plugins or the Meta Pixel[,] … [h]ow you use our partners' products and services, online or in person[,] … [and] information like your email address,

---

[50] META, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update.

[51] META, COOKIES POLICY, https://www.facebook.com/policies/cookies/.

[52] META, PRIVACY POLICY, https://www.facebook.com/privacy/policy.  *See also* https://mbasic.facebook.com/privacy/policy/printable/.

[53] META, UNITED STATES REGIONAL PRIVACY NOTICE, https://www.facebook.com/privacy/policies/uso/.

[54] META, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update.

[55] *Id.*

cookies and advertising device ID[.]"[56]  Specifically, Meta acknowledges that "[w]e collect and receive information from partners, … [and] receive this information whether or not you're logged in or have an account on our Products."[57]

77.    Meta then offers an express representation: "We require partners to have the right to collect, use and share your information before giving it to us."[58]  Meta also acknowledges collecting "information with special protections[,]" meaning information that "could have special protections under the laws of your jurisdiction[,]" but critically, only sensitive information that users "choose to provide."[59]

78.    Meta's Cookies Policy ratifies those representations, stating "the Privacy Policy will apply to our processing of the data that we collect via cookies."[60]

79.    For California residents, Meta reiterates that policy: "We require each of these partners to have rights to collect, use, and disclose your information before providing any information to us."[61]  The United States Regional Privacy Notice also restricts Meta's ability to collect "sensitive personal information," stating they "will only use or disclose it either with your specific consent when required, or as otherwise permitted by law, including the CCPA."[62]

80.    Meta's other representations reinforce these warranties.  In its Introduction to the Advertising Standards, Meta states "[w]e do not use sensitive personal data for ad targeting."[63]  And in a blog post titled "About prohibited information," Meta asserts it has "policies around the

---

[56] META, PRIVACY POLICY, https://www.facebook.com/privacy/policy.  *See also* https://mbasic.facebook.com/privacy/policy/printable/.

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] META, COOKIES POLICY, https://www.facebook.com/policies/cookies/.

[61] META, UNITED STATES REGIONAL PRIVACY NOTICE, https://www.facebook.com/privacy/policies/uso/.

[62] *Id.*

[63] META, INTRODUCTION TO THE ADVERTISING STANDARDS, https://www.facebook.com/policies/ads/.

kinds of information businesses can share with us."[64]  Meta does not want "advertisers to use the Meta Business Tools to share prohibited information about people[.]"[65]  Prohibited information includes, among other things, "information defined as sensitive under applicable laws, regulations or industry guidelines[.]"[66]

81.     These representations are repeated frequently.  Meta created a "Help Center" to better explain its practices to users.  In an article titled, "How Meta receives information from other businesses and organizations," Meta reiterates its promise to "prohibit businesses or organizations from sharing sensitive information with us," and if Meta "believe[s] that a business or organization is potentially violating our terms, we may take action against that business or organization."[67]  In another article, titled, "How does Meta work with data providers," Meta repeats this promise, stating "[b]usinesses that advertise on Facebook are required to have any necessary rights and permissions to use this information, as outlined in our Custom Audience Terms that businesses must agree to."[68]

82.     A reasonable user who reads Meta's terms and representations would understand those terms as requiring Meta to enforce an advertiser's compliance with its terms.  At a minimum, those terms and representations require Meta to build safeguards for sensitive information.  No reasonable user would read those terms and representations as permitting Meta to intentionally intercept electronic communications that it knows the law protects and deems sensitive.  And no user, reasonable or not, could read those terms as allowing Meta to aid and abet another party's disclosure of such protected and sensitive information.  In short, Meta never receives consent from users to intentionally intercept and monetize electronic communications disclosing sensitive information that the law protects.

---

[64] FACEBOOK, ABOUT PROHIBITED INFORMATION, https://www.facebook.com/business/help/1057016521436966?id=188852726110565.

[65] Id.

[66] Id.

[67] FACEBOOK, HOW META RECEIVES INFORMATION FROM OTHER BUSINESSES AND ORGANIZATIONS, https://www.facebook.com/help/2230503797265156.

[68] HOW DOES META WORK WITH DATA PROVIDERS, https://www.facebook.com/help/494750870625830.

## CLASS ALLEGATIONS

83.    Plaintiff seeks certification of the following class: all California residents who accessed and navigated the Website while in California (the "Class").

84.    Plaintiff reserves the right to modify the Class definition, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

85.    The following people are excluded from the Class: (1) any Judge presiding over this action and members of her or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest (including current and former employees, officers, or directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

86.    **Numerosity:** The number of persons within the Class is substantial and believed to amount to thousands, if not millions of persons.  It is, therefore, impractical to join each member of the Class as a named plaintiff.  Further, the size and relatively modest value of the claims of the individual members of the Class render joinder impractical.  Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation.  Moreover, the Class is ascertainable and identifiable from Defendant's records.

87.    **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class.  These common legal and factual questions, which do not vary between members of the Class, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to, the following: whether Defendant violated CIPA §§ 631 and 632 and whether Plaintiff and the proposed Class members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

88.    **Typicality:** The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other class members, visited the Website and had her confidential electronic communications intercepted and disclosed to Meta.

89.    **Adequate Representation:** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of members of the Class will be fairly and adequately protected by Plaintiff and her counsel.

90.    **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Classes.  Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSES OF ACTION

### COUNT I
### Violation Of The California Invasion Of Privacy Act,
### Cal. Penal Code § 631(a)

91.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

92.    Plaintiff brings this Count individually and on behalf of the members of the Class.

93.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978).  Thus, to establish liability

under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

94.    CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at \*21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at \*1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

95.    Meta's tracking technologies, including the Meta Pixel, are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

96.    Meta is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021).  Further, Meta had the capability to use the wiretapped information for its own purposes.  Accordingly, Meta was a third party to any communication between Plaintiff and Class Members, on the one hand, and Defendant,

on the other. *Id*. at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

97.    At all relevant times, by its tracking technologies, Meta willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and Class Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

98.    At all relevant times, Meta used or attempted to use the communications intercepted by its tracking technologies for its own purposes.

99.    At all relevant times, Defendant aided, agreed with, employed, permitted, or otherwise enabled Meta to wiretap Plaintiff and Class Members using Meta's tracking technologies and to accomplish the wrongful conduct at issue here.

100.    Defendant knows (and knew when procuring the Meta Pixel) that Meta is a separate and distinct entity from Hard Rock, the Hard Rock Website, the Hard Rock consumers, and the Hard Rock communications at issue.

101.    Defendant knows (and knew when procuring the tracking technologies at issue) that Meta uses its tracking technologies to eavesdrop upon and record Hard Rock communications to which Meta is not a party, and that Meta thereby collects the contents of communications between Hard Rock consumers and Hard Rock.

102.    The code for the Meta tracking technologies at issue did not spontaneously appear on the Website.   Instead, Meta's code was purposefully installed by Defendant into the HTML documents and/or other libraries defining the contents of the Website.  Meta explains: "to set up a Meta Pixel[,] … set up the [pixel] base code on your website. … [To do so, g]o to Meta Events Manager."[69]

---

[69] META, HOW TO SET UP AND INSTALL A META PIXEL, https://www.facebook.com/business/help/952192354843755?id=1205376682832142.  *See also* META, META PIXEL GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started ("Before you can install the Pixel, you will need your Pixel's base code, which you can find in the Ads Manager > Events Manager.").

103.    Defendant knows (and knew when procuring the tracking technologies at issue) what, *inter alia*, the "Meta Business Tools Terms" state regarding Meta's use of the contents of the communications here at issue for Meta's own, unlawful purposes.  Specifically, Defendant knows that Meta has the capability to use the information it wiretaps for purposes other than simply providing a recording to Defendant, including but not limited to its own contact information matching; measurement and analytics services; ad targeting; commercial and transactional messages; ad delivery improvement; feature and content personalization; and product improvement, provision, and securement.

104.    The "Meta Business Tools Terms" make clear: "When you use any of the Meta Business Tools to send us or otherwise enable the collection of Business Tool Data … these Business Tools Terms govern the use of that data."[70]

105.    Plaintiff and Class Members did not provide their prior consent to Meta's intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and Class Members' electronic communications.  Nor did Plaintiff and Class Members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling Meta's conduct.

106.    ███████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

---

[70] META, META BUSINESS TOOLS TERMS, https://m.facebook.com/legal/businesstech.

1

2

3

4

5    107.    The wiretapping of Plaintiff and Class Members occurred in California, where

6    Plaintiff and Class Members accessed the Website and where Meta – as enabled by Defendant –

7    routed Plaintiff's and Class Members' electronic communications its servers.

8    108.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured

9    by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of

10   Defendant's violations of CIPA § 631(a).

11   **COUNT II**
     **Violation Of The California Invasion Of Privacy Act,**
12   **Cal. Penal Code § 632**

13   109.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set

14   forth herein.

15   110.    Plaintiff brings this Count individually and on behalf of the members of the Class.

16   111.    CIPA § 632(a) prohibits an entity from:

17
           intentionally and without the consent of all parties to a confidential
18         communication, uses an electronic amplifying or recording device to
           eavesdrop upon or record the confidential communication, whether the
19         communication is carried on among the parties in the presence of one
           another or by means of a telegraph, telephone, or other device, except a
20         radio.

21   112.    Meta's tracking technologies, including the Meta Pixel, are "electronic amplifying or

22   recording device[s]."

23   113.    Cal. Civ. Code § 53.5(a) states:

24
           [A]n innkeeper, hotelkeeper, motelkeeper, lodginghouse keeper, or owner
25         or operator of an inn, hotel, motel, lodginghouse, or other similar
           accommodations, or any employee or agent thereof, who offers or accepts
26         payment for rooms, sleeping accommodations, or board and lodging, or
           other similar accommodation, shall not disclose, produce, provide, release,
27         transfer, disseminate, or otherwise communicate, except to a California
           peace officer, all or any part of a guest record orally, in writing, or by
28

electronic or any other means to a third party without a court-issued subpoena, warrant, or order.

114.    Per Cal. Civil Code § 53.5(c):

"Guest record" for purposes of this section includes any record that identifies an individual guest, boarder, occupant, lodger, customer, or invitee, including, but not limited to, their name, social security number or other unique identifying number, date of birth, location of birth, address, telephone number, driver's license number, other official form of identification, credit card number, or automobile license plate number.

115.    Here, Website users' communications with Hard Rock—made while browsing and booking Hard Rock hotels via the Website—contain sensitive and confidential "guest records."

116.    First, the communications include "record[s] that identif[y] an individual[.]" Cal. Civil Code § 53.5(c). As described *supra*, §§ IV, VI, Defendant enables Meta to identify individual Website users by their respective Facebook accounts, utilizing several cookies, including the c_user; datr; fr; and _fbp cookies. These pieces of data collected by Meta constitute "record[s] that identif[y] an individual" (Cal. Civil Code § 53.5(c)), as the cookies at issue contain "unique identifying number[s]" assigned to Website users. *Id.*

117.    Second, Website users' communications with Hard Rock "identif[y] an individual [as a Hard Rock] guest, boarder, occupant, lodger, customer, or invitee[.]" *Id.* Meta intercepts Website users' selections of the destination to which they wish to travel, the desired dates for their trip, the numbers of adults and children who will be traveling, their room type upgrades, and the particular hotel area in which they wish to stay. Meta intercepts button clicks and the URLs of webpages visited by Website users, which contain the foregoing communications. Meta also intercepts when users progress through and complete a booking on the Website. These communications "identif[y] an individual [as a Hard Rock] guest, boarder, occupant, lodger, customer, or invitee" (Cal. Civil Code § 53.5(c)) because they show that all Website users are "invitees" of Hard Rock – individuals with "express or implied invitation to enter or use [Hard Rock's] premises."[71] These communications also identify certain Website users (those who complete the booking process) as

---

[71] INVITEE, Black's Law Dictionary (11th ed. 2019).

1    Hard Rock hotel "guests" and "customers."

2        118.    Thus, Meta – as aided by Defendant – intercepted "guest records," which are

3    confidential, under Cal. Civil Code § 53.5.  Moreover, Meta is not a legitimate "third-party service

4    provider," as defined by Cal. Civil Code § 53.5(f), because Meta is not "an entity contracted to

5    provide services outlined in [a] contract [with Hard Rock] that has no independent right to use or

6    share the data beyond the terms of the contract."  Rather, Meta has the capability to use the

7    information it wiretaps for purposes other than simply providing a recording to Defendant.

8    Therefore, Defendant's conduct here at issue was not permitted by, *inter alia*, Cal. Civil Code §

9    53.5(i).

10        119.    When communicating with Defendant, Plaintiff and Class Members had an

11    objectively reasonable expectation of privacy, based on Cal. Civil Code § 53.5.  Thus, Plaintiff and

12    Class Members did not reasonably expect that anyone other than Defendant would be on the other

13    end of the communication, and that other, third-party entities like Meta, would intentionally use an

14    electronic amplifying or recording device to eavesdrop upon and record the confidential

15    communications of Plaintiff and Class Members.

16        120.    Plaintiff and Class Members did not consent to any of Meta's actions.  Nor have

17    Plaintiff or Class Members consented to Meta's intentional use of an electronic amplifying or

18    recording device to eavesdrop upon and record the confidential communications of Plaintiff and

19    Class Members.

20        121.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured

21    by Defendant's violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of

22    Defendant's violations of CIPA § 632(a).

23                            **PRAYER FOR RELIEF**

24        WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks

25    judgment against Defendant, as follows:

26            (a)    For an order certifying the Class, naming Plaintiff as representative
               of the Class, and naming Plaintiff's attorneys as Class Counsel to
27               represent the Class;

28

(b)   For an order declaring that Defendant's conduct violates the statute referenced herein;

(c)   For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)   For actual, compensatory, statutory, and/or punitive in amounts to be determined by the Court and/or jury;

(e)   For prejudgment interest on all amounts awarded;

(f)   For an order of restitution and all other forms of equitable monetary relief;

(g)   For injunctive relief as pleaded or as the Court may deem proper; and

(h)   For an order awarding Plaintiff and the Class their reasonable attorneys' fees, expenses, and costs of suit.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated:  June 30, 2025                          Respectfully submitted,

**BURSOR & FISHER, P.A**.


By:___*/s/ Philip L. Fraietta*_____
     Philip L. Fraietta

Philip L. Fraietta (State Bar No. 354768)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646)-837-7150
Facsimile: (212) 989-9163
Email: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: sbogdanovich@bursor.com

*Attorneys for Plaintiff*

**EXHIBIT 1**

**CONFIDENTIAL**

**EXHIBIT 2**

**CONFIDENTIAL**

**EXHIBIT 3**

**CONFIDENTIAL**